CAL–ALMOND, INC., a California corporation; Gold Hills Nut Company, a California corporation; Saulsbury Orchards and Almond Processing, Inc., a California corporation; Browns Lake Ranch, a Partnership consisting of Paul McManis and William Reeves; Mac Enterprises, Inc., a California corporation; Van Kay, Inc., a California corporation; and Derk Van Konynenburg, Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 92–477 C.

United States Court of Federal Claims.

Jan. 5, 1994.

Brian C. Leighton, Fresno, CA, and James A. Moody, Washington, DC, for plaintiffs.

Robert E. Kirschman, Jr., with whom were Asst. Atty. Gen. Frank W. Hunger, Director David M. Cohen, Asst. Director Jeanne E. Davidson, Dept. of Justice, Washington, DC, Frank Martin, Jr., Office of the General Counsel, Dept. of Agriculture, Washington, DC, for defendant.

OPINION

WIESE, Judge.

Plaintiffs Cal–Almond, Inc., Gold Hills Nut Company, and Saulsbury Orchards and Almond Processing, are processors or "handlers" of almonds; the other plaintiffs—Browns Lake Ranch, Mac Enterprises, Inc., Van Kay, Inc., and Derk Van Konynenburg—are growers or producers of almonds. Both groups come together in this suit to seek compensation under the takings clause of the Fifth Amendment for what they allege are losses in crop value imposed upon them through almond marketing controls established by the Secretary of Agriculture acting under the authority of the Agricultural Marketing Agreement Act of 1937, as amended, 7 U.S.C. §§ 601–602, 608, 608a–c, 610, 612, 672–674 (1988 & Supp. IV 1992).

The case is presented for decision on the basis of plaintiffs' motion for summary judgment on liability and defendant's cross-motion to dismiss for failure to state a claim upon which relief can be granted. Upon consideration of the parties' positions, as presented to the court both through written briefs and oral argument, it is concluded that defendant's position is correct. We explain below.

*FACTS*

The Agricultural Marketing Agreement Act of 1937 (AMAA) is one of a number of statutes enacted during the Depression years

to assist in the rebuilding of the Nation's economy. The Act seeks to restore and preserve the purchasing power of farmers through the reconstruction and maintenance of orderly marketing conditions for agricultural commodities. 7 U.S.C. §§ 601, 602.

To facilitate this goal, the Act empowers the Secretary to enter into agreements with producers that put into effect marketing controls to govern the supply and distribution of agricultural commodities. 7 U.S.C. § 608c. Such controls, implemented through regulations known as "marketing orders," adopt a variety of mechanisms including restrictions on the quantity and quality of product brought to market; differentiations in pricing between primary and secondary markets; and limitations on production among growers. Additionally, marketing orders may provide for producers and handlers to share in the proceeds from the sale of commodity reserves and surpluses and also for the self-funding of commodity research, development, and advertising programs.

Pursuant to the authority set out at § 8c(7)(C) of the AMAA, marketing orders involving fruits, vegetables and other commodities (including dried fruits and nuts) are administered by committees of industry representatives selected by the Secretary from nominees chosen by the community of growers and handlers. One of the tasks for which the industry committees are responsible is submitting marketing recommendations to the Secretary based upon assessments of anticipated crop yields and prospective product demand. Following notice and comment rule making, the Secretary may then adopt these recommendations as final marketing orders for the crop year in question.

The demand for compensation that we encounter in this case grows out of the almond marketing orders that were issued by the Secretary during the crop years 1982

through 1985 and also 1988 and 1990.[1] In each of these years the Secretary, acting on the basis of recommendations provided by the Almond Board of California—the industry group established by the Secretary's almond regulations, *see* 7 C.F.R. § 981.30 (1993)[2]—ordered that a percentage of the anticipated crop be set aside, *i.e.*, held in reserve, for sale to non-competitive outlets such as school lunch programs, charitable institutions, and producers of animal and poultry feeds. The reserve percentages varied from year to year, ranging from a low of two percent in 1982 to a high of thirty-five percent in 1990. (The thirty-five percent figure was subsequently modified, through incremental reductions authorized over the course of the crop year, to a final figure of seven percent).

Under the terms of the almond marketing order, implementation of the set-aside requirement is accomplished through restrictions on distribution: each handler is required to withhold from sale in the open market a percentage of the almonds under its control equal to the specified reserve percentage. 7 C.F.R. § 981.50. To satisfy this obligation, a handler may either (i) deliver the required percentage to the Almond Board for sale into non-competitive channels, with the net proceeds of the sale being remitted to the handler, 7 C.F.R. §§ 981.51, 981.66(a), (g), or (ii) retain the reserve almonds and, at the same time, enter into an "agency agreement" with the Almond Board agreeing to dispose of the almonds in non-competitive outlets. 7 C.F.R. § 981.67.

In addition to making handlers the focal point of distribution control, almond marketing orders also place upon handlers responsibility for the administrative expenses of the Almond Board. These expenses are addressed through Board-imposed assessments levied on all almonds that a handler has

---

1. Almonds became subject to marketing controls in 1950 at the urging of the California Almond Growers Exchange, a growers' cooperative now known as Blue Diamond.

2. The Almond Board of California is comprised of ten members: five producers and five handlers. Representation on the Board is divided between independent growers and handlers and

cooperative growers and handlers on the basis of crop tonnage, *i.e.*, majority control is given over to that group responsible for growing and handling more than fifty percent of the tonnage delivered during the previous crop year. 7 C.F.R. §§ 981.30–981.32. In 39 of the 43 years since the creation of the Almond Board, majority control has resided with Blue Diamond.

received for its own account. 7 C.F.R. § 981.81.

The two aspects of the almond marketing order just described—the reserve mechanism and the handler's liability for the administrative expenses of the Almond Board—are the matters that have prompted this suit. More specifically, during the crop years in issue, the sale of almonds into the off-market often returned less than ten cents per pound in contrast to an open market price that ranged from $1.10 per pound to approximately $2.00 per pound. On the basis of this difference in price, plaintiffs maintain that the reserve system has forced upon them losses of several million dollars in product sales. Additionally, they say they have been required to absorb several thousand dollars of administrative expenses related to the activities of the Almond Board. In toto, the amount claimed approaches 5 million dollars.[3] These facts, plaintiffs contend, establish a taking of their property.

### DISCUSSION

In considering plaintiffs' claim, we start with what is not in dispute. Plaintiffs concede that the Government has authority, under the Commerce Clause, to regulate the sale and marketing of almonds. They acknowledge also that the manner in which that authority was exercised in this case is consistent with the Secretary's statutory mandate. Nevertheless, plaintiffs contend that the scheme of regulation that we encounter here amounts to a *per se* taking because it effects a displacement, in favor of the Secretary, of virtually all of a handler's property rights in the almonds held in reserve; hence, a confiscation.

To support this contention, plaintiffs point out that once a reserve is announced, the Secretary's regulations grant the Almond Board plenary authority to (i) sell or dispose of the almonds involved, (ii) permit a handler's disposition of the almonds only when

acting in the capacity of an agent of the Almond Board, and (iii) bar sale of the almonds in normal trade channels. Furthermore, it is noted that while a handler retains a right to the proceeds from these market-restricted sales, the amounts recovered are seldom sufficient to meet the commodity's purchase and storage costs. On the basis of these considerations, plaintiffs maintain that the Government has relegated unto itself the most essential attribute of commodity ownership—control over disposition—while leaving plaintiffs in the position of having to accept whatever value such disposition might yield, no matter how minimal. This realignment of ownership rights plaintiffs call a *per se* taking.

The second argument plaintiffs present looks beyond the mechanics of the reserve system and focuses instead on the economic consequences of that system. Plaintiffs contend that even if the court does not accept the claim of a *per se* taking, nevertheless, the reserve system deprives a handler of substantially all economic value in the almonds placed in reserve and therefore amounts to a taking by regulation.

Defendant urges us to reject these arguments on the ground that neither is analytically sound. Each of these arguments, defendant contends, requires as its logical antecedent a property right permitting plaintiffs to market their almonds free of regulatory controls. Defendant argues that plaintiffs do not have such a right and thus have suffered no compensable intrusion upon their interests in the almond crop. We agree with defendant.

Government regulation of the almond industry in the manner herein described has been a fact of life for now well over forty years. Thus, parties, like our plaintiffs, who have been active participants in that industry throughout that time, must be understood to have accepted, as a condition of their continu-

---

3. On a cumulative basis, the almond reserve requirements imposed during the years in issue involved in excess of 3 million pounds. Of this total reserve amount, approximately 2.2 million pounds is attributable to Saulsbury, roughly 1.1 million pounds is attributable to Cal–Almond and over 500,000 pounds is attributable to Gold Hills.

In terms of dollars lost, Cal–Almond and Saulsbury each assert economic injury of approximately $2 million while Gold Hills claims a direct adverse effect of almost $200,000. Additionally, plaintiffs say the growers suffered unrecovered farming costs approximating $200,000.

ing presence in that industry, the very mode of regulation about which they now complain. One who "embarks in a business which public interest demands ... be regulated ... must know regulation will ensue." *Nebbia v. New York,* 291 U.S. 502, 534, 54 S.Ct. 505, 514, 78 L.Ed. 940 (1934).

Plaintiffs do not escape the consequences of this result by claiming, as they do, that the Secretary's regulations go beyond what reasonably could have been anticipated at the outset. On more than one occasion, the Supreme Court has declared that commercial dealings subject to regulatory control must contend with the possibility that the "legislative scheme [may be] buttressed by subsequent amendments to achieve the legislative end." *Connolly v. Pension Benefit Guaranty Corp.,* 475 U.S. 211, 227, 106 S.Ct. 1018, 1027, 89 L.Ed.2d 166 (1986) (quoting *F.H.A. v. Darlington, Inc.,* 358 U.S. 84, 91, 79 S.Ct. 141, 146, 3 L.Ed.2d 132 (1958)). Indeed, only recently, in *Lucas v. South Carolina Coastal Council,* —— U.S. ——, ——, 112 S.Ct. 2886, 2899, 120 L.Ed.2d 798 (1992), the Court reiterated that "by reason of the State's traditionally high degree of control over commercial dealings, [an owner of personal property] ought to be aware of the possibility that new regulation might even render his property economically worthless (at least if the property's only economically productive use is sale or manufacture for sale)."

What underlies this rule is the Government's plenary authority over commerce. That authority, where it exists, has been described as "complete and perfect." *United States v. Rock Royal Co-operative, Inc.,* 307 U.S. 533, 569, 59 S.Ct. 993, 1011, 83 L.Ed. 1446 (1939). Given, therefore, the pervasive presence of the Federal Government in the regulation of American agriculture during the past half-century, plaintiffs cannot reasonably assert a property interest in their almond crops free of Government control. The Government's power to regulate the flow of agricultural products affecting interstate commerce is a pre-existing limitation on plaintiffs' property interests in their almonds. The legitimate exercise of that power cannot give rise to a taking claim.[4]

## CONCLUSION

Property rights are created and defined " 'by existing rules or understandings that stem from an independent source such as state law.' " *Webb's Fabulous Pharmacies, Inc. v. Beckwith,* 449 U.S. 155, 161, 101 S.Ct. 446, 451, 66 L.Ed.2d 358 (1980) (quoting *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972)). The plaintiffs in this suit can point to no existing rules or understandings that would give substance to their claim that, because of the marketing constraints imposed upon them by the Government's exercise of its power over interstate commerce, they are entitled to compensation.

Plaintiffs have failed to state a claim on which relief can be granted. Accordingly, we grant defendant's motion to dismiss and direct the entry of judgment dismissing the complaint.

---

4. In deciding this case on the single ground discussed in the opinion, we do not mean to signify agreement with plaintiffs' view that the almonds held in reserve represent a separable component of property, distinct from the remainder of the annual crop. To the contrary, for Fifth Amendment purposes, "property" may not be defined more narrowly than the investment-backed expectation supporting it. *Keystone Bituminous Coal Ass'n v. DeBenedictis,* 480 U.S. 470, 497–99, 107 S.Ct. 1232, 1248–49, 94 L.Ed.2d 472 (1987). It is at least arguable, therefore, that correctly defined, plaintiffs' "property" consists of the *entirety* of their respective annual crops. Pursuing this definition would, presumably, moot any claim to compensation since plaintiffs do not contend that their businesses, *as a whole,* have been rendered unprofitable by the Secretary's regulations.