# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MARVIN D. HORNE and LAURA R.
HORNE, d.b.a. RAISIN VALLEY
FARMS, a partnership, and d.b.a.
RAISIN VALLEY FARMS MARKETING
ASSOCIATION, a.k.a. RAISIN VALLEY
MARKETING, an unincorporated
association; MARVIN D. HORNE;
LAURA R. HORNE; DON DURBAHN,
and the ESTATE OF RENA DURBAHN,
d.b.a. LASSEN VINEYARDS, a
partnership,

        *Plaintiffs-Appellants,*

        v.

UNITED STATES DEPARTMENT OF
AGRICULTURE,

        *Defendant-Appellee.*

No. 10-15270

D.C. No.
1:08-cv-01549-LJO-
SMS

OPINION

Appeal from the United States District Court
for the Eastern District of California
Lawrence J. O'Neill, District Judge, Presiding

Argued and Submitted
April 14, 2011—Pasadena, California

Filed July 25, 2011

Before: Stephen Reinhardt, Michael Daly Hawkins, and
Ronald M. Gould, Circuit Judges.

Opinion by Judge Hawkins

9453

## COUNSEL

Brian C. Leighton, Clovis, California, for the plaintiffs-appellants.

Benjamin B. Wagner, United States Attorney, and Benjamin E. Hall, Assistant United States Attorney, Fresno, California, for the defendant-appellee.

## OPINION

HAWKINS, Senior Circuit Judge:

This appeal of a United States Department of Agriculture ("USDA") administrative decision asks us to interpret and pass on the constitutionality of a food product reserve program authorized by the Agricultural Marketing Agreement Act of 1937, as amended, 7 U.S.C. § 601 *et seq.* ("AMAA"), and implemented by the Marketing Order Regulating the Han-

dling of Raisins Produced from Grapes Grown in California, 7 C.F.R. Part 989 ("Raisin Marketing Order" or "the Order"), first adopted in 1949. Farmers Marvin and Laura Horne ("the Hornes"[1]) protest the USDA Judicial Officer's ("JO") imposition of civil penalties and assessments for their failure to comply with the reserve requirements, among other regulatory infractions, contending: (1) they are producers not subject to the Raisin Marketing Order's provisions; (2) even if subject to those provisions, the requirement that they contribute a specified percentage of their annual raisin crop to the government-controlled reserve pool constitutes an uncompensated *per se* taking in violation of the Fifth Amendment; and (3) the penalties imposed for their "self-help" noncompliance with the Raisin Marketing Order violate the Eighth Amendment Excessive Fines Clause. We affirm.

## BACKGROUND

### I. Regulatory Framework

Raisins and other agricultural commodities are heavily regulated under federal marketing orders adopted pursuant to the AMAA, a Depression-era statute enacted in response to plummeting commodity prices, market disequilibrium, and the accompanying threat to the nation's credit system. 7 U.S.C. § 601 *et seq.*; *see Zuber v. Allen*, 396 U.S. 168, 174-76 (1969); *see generally* Daniel Bensing, "The Promulgation and Implementation of Federal Marketing Orders Regulating Fruit and Vegetable Crops Under the Agricultural Marketing Agreement Act of 1937," 5 *San Joaquin Agric. L. Rev.* 3 (1995). The declared purposes of the AMAA are, *inter alia*,

---

[1]Collectively referred to as "the Hornes," the Plaintiffs-Appellants are Marvin and Laura Horne, d/b/a Raisin Valley Farms (a California general partnership), and d/b/a Raisin Valley Farms Marketing Association (a California unincorporated association), together with their business partners Don Durbahn and the Estate of Rena Durbahn, collectively d/b/a Lassen Vineyards (a California general partnership).

to help farmers achieve and maintain price parity for their agricultural goods and to protect producers and consumers alike from "unreasonable fluctuations in supplies and prices" by establishing orderly marketing conditions. 7 U.S.C. § 602; *see Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 138 (1963); *Pescosolido v. Block*, 765 F.2d 827, 830 (9th Cir. 1985).

[1] To achieve these goals, the AMAA delegates authority to the Secretary of Agriculture ("Secretary") to issue marketing orders[2] regulating the sale and delivery of agricultural goods, 7 U.S.C. § 608c, principally by imposing production quotas or by restricting the supply of a commodity for sale on the open market, either through marketing allotments or reserve pools, *see id.* § 608c(6).[3] The Secretary, in turn, is authorized to delegate to industry committees the power to administer marketing orders. 7 U.S.C. § 608c(7)(C); *see* 7 C.F.R. § 989.35 (2006). Marketing orders under the AMAA

---

[2]According to the specific promulgation procedures mandated by the AMAA, the Secretary may only issue a marketing order if, after providing notice and opportunity for hearing, he finds that "the issuance of such order . . . will tend to effectuate the declared policy" of the Act. 7 U.S.C. § 608c(3)-(4). Such order will not become effective until approved by both (1) the handlers of at least 50 percent of the volume of the commodity covered by the proposed order and (2) either (a) two-thirds of producers of that commodity during a representative period or (b) producers of two-thirds of the volume of that commodity during said period. *Id.* § 608c(8); *see id.* § 608b. The Secretary may terminate or suspend any marketing order upon finding it "obstructs or does not tend to effectuate the declared policy" of the Act, or upon request of a majority of active producers during a representative time period. *Id.* § 608c(16).

[3]Section 8c of the AMAA, 7 U.S.C. § 608c, the key statutory provision dealing with the marketing orders, originated in a 1935 amendment to the Agricultural Adjustment Act of 1933, Pub. L. No. 73-10, 48 Stat. 31 ("AAA"). The Supreme Court invalidated parts of the AAA in 1936, *see United States v. Butler*, 297 U.S. 1, 77 (1936), but Congress quickly reenacted most of the AAA's production-control measures in the AMAA, which the Supreme Court subsequently upheld against various constitutional challenges, *see United States v. Rock Royal Co-op, Inc.*, 307 U.S. 533 (1939).

apply only to "handlers," i.e., those who process and pack agricultural goods for distribution,[4] and do not apply to any producer "in his capacity as a producer."[5] 7 U.S.C. §§ 608c(1), 608c(13)(B).[6] Any handler who fails to comply with the terms of a marketing order is subject to civil forfeiture, as well as possible civil and criminal penalties. 7 U.S.C. §§ 608a(5), 608a(6), 608c(14) (authorizing civil penalties up to $1,000 for each violation, with each day constituting a separate violation).

---

[4]A "handler" under the Raisin Marketing Order is

> (a) [a]ny processor or packer; (b) any person who places, ships, or continues natural raisins in the current of commerce from within [California] to any point outside thereof; (c) any person who delivers off-grade raisins, other failing raisins or raisin residual material to other than a packer or other than into any eligible non-normal outlet; or (d) any person who blends raisins [subject to certain exceptions].

7 C.F.R. § 989.15. A "packer," in turn, is "any person who, within [California], stems, sorts, cleans, or seeds raisins, grades stemmed raisins, or packages raisins for market as raisins," but does not include a producer who sorts and cleans his own raisins in their unstemmed form. *Id.* § 989.14.

[5]A "producer" under the Raisin Marketing Order is "any person engaged in a proprietary capacity in the production of grapes which are sun-dried or dehydrated by artificial means until they become raisins." 7 C.F.R. § 989.11.

[6]The regulation of handlers, as opposed to growers, appears to be a vestige of the historical context in which the AMAA was enacted, "an era when small, independent growers were frequently left to the mercy of large handlers who could benefit from their market power and position." Bensing, *supra*, at 8. In the raisin industry, producers generally own the land on which the grapevines are located, and they typically pick the grapes and dry them on trays before selling the unstemmed raisins to packers, or "handlers." Packers then prepare the raisins for commercial sale and distribution by cleaning, stemming, seeding, grading, sorting, and packaging the raisins into containers. Packers then typically sell the packed raisins to wholesalers, distributors, and other dealers for resale and distribution to the public. *Brown v. Parker*, 39 F. Supp. 895, 896-97 (S.D. Cal. 1941), *rev'd on other grounds by Parker v. Brown*, 317 U.S. 341 (1943).

The Raisin Marketing Order was originally enacted in 1949, *see* 14 Fed. Reg. 5136 (Aug. 18, 1949) (codified, as amended, at 7 C.F.R. Part 989), in an effort to stabilize raisin prices by controlling production surpluses, which since 1920 had consistently been thirty to fifty percent of each year's crop. *See Parker*, 317 U.S. at 363-64.[7] Like many other fruit and vegetable orders issued under the AMAA,[8] the Order provides for the establishment of annual reserve pools, as determined by each year's crop yield, thereby removing surplus raisins from sale on the open domestic market and indirectly controlling prices. *See* 7 U.S.C. § 608c(6)(E); 7 C.F.R. §§ 989.54(d), 989.65. By February 15 of each year, the Raisin Administrative Committee ("RAC")—an industry committee charged with administration of the Raisin Marketing Order,[9]

---

[7]The raisin industry has long been an important one in California, where 99.5 percent of the U.S. crop and 40 percent of the world's crop are produced. *See* The California Raisin Industry, http://www.calraisins.org/about/the-raisin-industry/ (last visited July 6, 2011). Raisin prices rose rapidly between 1914 and 1920, peaking in 1921 at $235 per ton. This price increase spurred increased production, which in turn caused prices to plummet back down to between $40 and $60 per ton, even while production continued to expand. As a result of this growing disparity between increasing production and decreasing prices, the industry became "compelled to sell at less than parity prices and in some years at prices regarded by students of the industry as less than the cost of production," finally prompting federal government intervention with the Raisin Marketing Order in 1949. *See Parker*, 317 U.S. at 363-64 & nn.9-10.

[8]For a comparison of the Raisin Marketing Order and marketing orders for other agricultural products, such as walnuts, almonds, prunes, tart cherries, and spearmint, see *Evans v. United States*, 74 Fed. Cl. 554, 558 (2006)*, aff'd*, 250 Fed. Appx. 321 (Fed. Cir. 2007).

[9]The RAC is currently comprised of forty-seven industry-nominated representatives appointed by the Secretary, of whom thirty-five represent producers, ten represent handlers, one represents the cooperative bargaining association, and one represents the public. *See* 7 C.F.R. §§ 989.26, 989.29, 989.30. The RAC is an agent of the federal government but receives no federal appropriations. Instead, it is funded by assessments levied on handlers per ton of raisins sold on the open market and by proceeds from the sale of reserve-tonnage raisins. *See* 7 C.F.R. §§ 989.53, 989.79, 989.80(a), 989.82.

*see* 7 C.F.R. §§ 989.35, 989.36—recommends the "reserve-tonnage" and "free-tonnage" percentages for that year, which the Secretary then promulgates. *See id.* §§ 989.54(d), 989.55. The reserve-tonnage requirement varies from year to year; for example, in the 2002-03 and 2003-04 crop years at issue here, the reserve percentages were set at forty-seven percent and thirty percent of a producer's crop, respectively.

As a result of the Order's reserve program requirements, a producer receives payment (at a pre-negotiated field market price) upon delivery of raisins to a handler only for the free-tonnage raisins, which the handler is then free to sell on the domestic market without restrictions. *See id.* § 989.65. The reserve-tonnage raisins, on the other hand, must be held by the handler in segregated bins "for the account" of the RAC until the RAC sells them to handlers for resale in export markets or directs that they be sold or disposed of in secondary, non-competitive markets, such as school lunch programs, either by direct sale or gift to U.S. agencies or foreign governments. *Id.* §§ 989.54, 989.56, 989.65, 989.67, 989.166, 989.167. The reserve pool sales are used to finance the RAC's administration, and any remaining net proceeds must then be equitably distributed to the producers on a pro rata basis. *See* 7 U.S.C. § 608c(6)(E) (providing for "the equitable distribution of the net return derived from the sale [of reserve-pool raisins] among the persons beneficially interested therein"); 7 C.F.R. § 989.66(h). Thus, although producers do not receive payment for reserve-tonnage raisins at the time of delivery to a handler, they retain a limited equity interest in the net proceeds of the RAC's disposition of the reserve, to be paid at a later time.

The RAC is tasked with selling the reserve raisins in a manner "intended to maxim[ize] producer returns and achieve maximum disposition of such raisins by the time reserve tonnage raisins from the subsequent crop year are available," 7 C.F.R. § 989.67(d)(1), but the Hornes complain that they have not received any reserve sale proceeds since the mid-1990s.

For example the RAC designated forty-seven percent of the 2002-03 crop as reserve tonnage, which it then sold for $970 per ton, but none of the money the RAC received was paid back to the raisin producers.

In addition to the reserve pool requirement, the Raisin Marketing Order obliges handlers to, *inter alia*: file reports with the RAC, pay assessments to the RAC, and grant the RAC access to records for auditing purposes. *See id.* §§ 989.58, 989.59, 989.73, 989.77, 989.80.

## II.   The Hornes' Raisin Enterprises

Marvin and Laura Horne have been producing raisins in Fresno and Madera Counties in California since 1969 and in 1999 registered as a California general partnership under the name Raisin Valley Farms. They also own and operate Lassen Vineyards, another registered California general partnership, in partnership with Laura's parents, Don and Rena Durbahn. Disillusioned with a regulatory scheme they deemed "outdated" and exploitive of farmers, the Hornes looked for ways to avoid the Raisin Marketing Order's requirements, particularly its mandatory raisin reserve program. Because those requirements apply only to handlers, the Hornes implemented a plan to bring their raisins to market without going through a traditional middle-man packer. As part of their plan, the Hornes purchased their own equipment and facilities to clean, stem, sort, and package raisins, which they installed on Lassen Vineyards property in 2001. Not only did this facility handle the raisins from Raisin Valley Farms and Lassen Vineyards, it also contracted with more than sixty other raisin growers to clean, stem, sort, and in some cases box and stack their raisins for a per-pound fee, typically twelve cents per pound.[10] USDA records reflect that Lassen Vineyards packed out more than

---

[10]This type of arrangement is known as "toll packing." Toll packers do not acquire ownership of the commodity but instead provide a packing service for a fee.

1.2 million pounds of raisins during the 2002-03 crop year and more than 1.9 million pounds during the 2003-04 crop year.

Meanwhile, the Hornes also organized these sixty-some growers into the Raisin Valley Marketing Association, an unincorporated association that marketed and sold raisins to wholesale customers on its members' behalf, while the growers maintained ownership over their own raisins. Raisin Valley Marketing then held the sales funds on the growers' behalf in a trust account, from which it paid Lassen Vineyards its packing fees, paid a third-party broker fee, and distributed the net proceeds to the growers.

## III.  Proceedings Below

The Administrator of the Agricultural Marketing Service initiated an enforcement action against the Hornes, alleging violations of the AMAA and failure to comply with the Raisin Marketing Order's various requirements. On appeal from an Administrative Law Judge's decision following an on-the-record hearing, the USDA JO found both Raisin Valley Farms and Lassen Vineyards liable for: (1) twenty violations of 7 C.F.R. § 989.73 (filing of inaccurate reports); (2) fifty-eight violations of 7 C.F.R. § 989.58(d) (failing to obtain incoming inspections); (3) 592 violations of 7 C.F.R. § 989.66 and 7 C.F.R. § 989.166 (failing to hold reserve raisins for the 2002-03 and 2003-04 crop years); (4) two violations of 7 C.F.R. § 989.80 (failing to pay assessments to the RAC); and (5) one violation of 7 C.F.R. § 989.77 (failing to allow the Agricultural Marketing Service access to records). The JO accordingly ordered the Hornes to pay (1) $8,783.39 in unpaid assessments for the 2002-03 and 2003-04 crop years, pursuant to 7 C.F.R. § 989.80(a); (2) $483,843.53, the alleged dollar equivalent of the withheld raisin reserve contributions for the 2002-03 (632,427 pounds) and 2003-04 (611,159 pounds[11])

---

[11]The Hornes do not challenge the JO's calculation of these figures.

crop years, pursuant to 7 C.F.R. § 989.166(c); and (3) $202,600 in civil penalties, pursuant to 7 U.S.C. § 608c(14)(B).

The Hornes filed this action in district court seeking judicial review of a final agency decision pursuant to 7 U.S.C. § 608c(14)(B).[12] On cross-motions for summary judgment, the district court granted summary judgment for the USDA, and the Hornes timely appealed.

## STANDARDS OF REVIEW

A district court's grant of summary judgment is reviewed de novo. *Ariz. Life Coal., Inc. v. Stanton*, 515 F.3d 956, 962 (9th Cir. 2008). Viewing the evidence in the light most favorable to the non-moving party, we must determine whether any genuine issues of material fact remain and whether the district court correctly applied the relevant substantive law. *Lopez v. Smith*, 203 F.3d 1122, 1131 (9th Cir. 2000) (en banc). We review de novo a constitutional challenge to a federal regulation. *Doe v. Rumsfeld*, 435 F.3d 980, 984 (9th Cir. 2006) (citing *Gonzales v. Metro. Transp. Auth.*, 174 F.3d 1016, 1018 (9th Cir. 1999)). We also review de novo whether a fine is unconstitutionally excessive. *United States v. Mackby*, 339 F.3d 1013, 1016 (9th Cir. 2003) *(citing United States v. Bajakajian*, 524 U.S. 321, 337 n.10 (1998)).

---

[12]In a separate action not the subject of this appeal, the Hornes filed an administrative petition before the Secretary of Agriculture in March 2007 pursuant to 7 U.S.C. § 608c(15)(A) challenging the Raisin Marketing Order and its application to them. The JO granted the USDA's motion to dismiss for lack of standing. The Hornes filed a complaint in district court, but the district court dismissed it for lack of subject matter jurisdiction because it was not timely filed, and we affirmed. *See Horne v. U.S. Dep't of Agric.*, 395 Fed. Appx. 486 (9th Cir. Sep. 27, 2010) (unpublished).

## DISCUSSION

### I. Application of the Raisin Marketing Order to the Hornes

For the reasons discussed in the district court's opinion below, we conclude that the Hornes, who admit that their toll-packing business "stems, sorts, cleans," and "packages raisins for market as raisins," 7 C.F.R. § 989.14, satisfy the regulatory definition of a "packer" and are thus "handlers" subject to the Raisin Marketing Order's provisions, *see* 7 C.F.R. § 989.15. *See Horne v. U.S. Dep't of Agric.*, 2009 U.S. Dist. LEXIS 115464, at \*20-49 (E.D. Cal. Dec. 11, 2009). The USDA's interpretation of its own regulation is not "plainly erroneous or inconsistent with the regulation" and thus must be given "controlling weight." *See Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414 (1945); *accord Auer v. Robbins*, 519 U.S. 452, 461 (1997); *Miller v. Cal. Speedway Corp.*, 536 F.3d 1020, 1028 (9th Cir. 2008). Furthermore, its findings regarding the Hornes' handler operations are supported by substantial evidence and are neither arbitrary nor capricious. *See* 5 U.S.C. § 706(2)(A), (E).

**[2]** The Hornes argue they are statutorily exempt from regulation because they also satisfy the regulatory definition of a "producer," and the AMAA provides that "[n]o order issued under this chapter shall be applicable to any producer in his capacity as a producer." 7 U.S.C. § 608c(13)(B). However, by expressly limiting the exemption from regulation only to a producer "in his capacity as a producer," the AMAA contemplates that an individual who performs both producer and handler functions may still be regulated in his capacity as a handler. Even if the AMAA is considered "silent or ambiguous" on the regulation of individuals who perform both producer and handler functions, we must give *Chevron* deference to the permissible interpretation of the Secretary of Agriculture, who is charged with administering the statute. *Chevron, USA, Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837,

842-43 (1984); *see* 7 U.S.C. § 608c(1); *see also Morales-Izquierdo v. Dep't of Homeland Sec.*, 600 F.3d 1076, 1086-87 (9th Cir. 2010); *Midway Farms v. U.S. Dep't of Agric.*, 188 F.3d 1136, 1140 n.5 (9th Cir. 1999). Other courts have similarly rejected the Hornes' argument that a producer who handles his own product for market is statutorily exempt from regulation under the AMAA. *See, e.g.*, *Freeman v. Vance*, 319 F.2d 841, 842 (5th Cir. 1963) (per curiam); *Ideal Farms, Inc. v. Benson*, 288 F.2d 608, 614 (3d Cir. 1961), *cert. denied*, 372 U.S. 965 (1963); *Evans*, 74 Fed. Cl. at 557-58. Deferring to the agency's permissible interpretation of the statute, as we must, we conclude that applying the Raisin Marketing Order to the Hornes in their capacity as handlers was not contrary to the AMAA.

## II. Takings Claim

Does the Raisin Marketing Order's reserve requirement program constitute a physical, *per se* taking of the Hornes' personal property without just compensation, in violation of the Fifth Amendment? *See* U.S. Const. amend. V ("[N]or shall private property be taken for public use, without just compensation."). We join the Court of Federal Claims, which not long ago decided this exact question, in holding it does not. *See Evans*, 74 Fed. Cl. at 562-64; *cf. Cal-Almond, Inc. v. United States*, 30 Fed. Cl. 244, 246-47 (1994) (rejecting a takings claim against a similar reserve program under the almond marketing order).

The Fifth Amendment Takings Clause does not itself authorize the taking of private property, nor does it prohibit the government from doing so. Instead, it imposes conditions on the government's authority to act, providing that *when* government takes private property, pursuant to the lawful exercise of its constitutional powers, (1) it must take for public rather than private use, and (2) it must provide owners with just compensation, as measured by the property owner's loss. *See Brown v. Legal Found. of Wash.*, 538 U.S. 216, 231-32,

235-36 (2003); *First English Evangelical Lutheran Church of Glendale v. Cnty. of L.A.*, 482 U.S. 304, 314 (1987). The former condition ensures that government does not abuse its powers by taking private property for another's private gain, *see, e.g.*, *Penn. Coal Co. v. Mahon*, 260 U.S. 393, 413 (1922); the latter ensures that even when government acts in the public interest, it does not "forc[e] some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole," *Armstrong v. United States*, 364 U.S. 40, 49 (1960).

**[3]** In its earliest days, the Takings Clause was thought to apply only to "direct appropriation of property, or the functional equivalent of a practical ouster of the owner's possession," *Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 537 (2005) (internal quotation marks and brackets omitted), i.e., "physical takings." *See Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1028 n.15 (1992). Over the years, its reach has extended to accommodate the modern reality that "government regulation of private property may, in some instances, be so onerous that its effect is tantamount to a direct appropriation or ouster." *Lingle*, 544 U.S. at 537; *see also Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 427-38 (1982) (surveying evolution of the takings doctrine). Most takings challenges to governmental regulations must undergo an ad hoc, fact-intensive inquiry focusing on (1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation interferes with reasonable investment-backed expectations; and (3) the character of the governmental action. *Penn Cent. Transp. Co. v. N.Y.C.*, 438 U.S. 104, 124 (1978). Only in two situations does the Supreme Court recognize that regulatory action *per se* "goes too far" in frustrating property rights, *Mahon*, 260 U.S. at 415: first, "where government requires an owner to suffer a permanent physical invasion of her property[,] however minor," *Lingle*, 544 U.S. at 538; *see, e.g.*, *Loretto*, 458 U.S. at 438 (compensation required where state law forced landlords to permit cable companies to install cable facilities occupying one and one-

half square feet of rooftops); *Kaiser Aetna v. United States*, 444 U.S. 164, 179-80 (1979) (same for imposition of navigational servitude upon private marina); *United States v. Causby*, 328 U.S. 256, 265 & n.10 (1946) (same for physical invasions of airspace); and second, where government regulation "denies *all* economically beneficial or productive use of land," *Lucas*, 505 U.S. at 1015 (emphasis added) (compensation required where state law barring construction of any permanent habitable structures on beachfront property rendered land parcels "valueless"). When government action results in such a "total regulatory taking[ ]," *id.* at 1026, as opposed to a mere "partial regulatory taking[ ]," *Tahoe-Sierra Pres. Council v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 326 (2002), a property owner is categorically entitled to compensation, without resort to the usual case-specific inquiry.

**[4]** The Hornes, however, do not claim that the Raisin Marketing Order effects a regulatory taking, partial or total. Instead, they insist we need look no further than the RAC's annual "direct appropriation" of their reserve-tonnage raisins to conclude this is a classic *physical* taking. Though the simplicity of their logic has some understandable appeal—their raisins are personal property, personal property is protected by the Fifth Amendment, and each year the RAC "takes" some of their raisins, at least in the colloquial sense—their argument rests on a fundamental misunderstanding of the nature of property rights and instead clings to a phrase divorced from context.

It is undisputed that the Fifth Amendment guarantees compensation for the taking not only of real property but also of personal property and even intangible property. *See Phillips v. Wash. Legal Found.*, 524 U.S. 156, 172 (1998) (interest earned on lawyers' trust account is a protected private property); *Brown*, 538 U.S. at 235 (same); *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1001-04 (1984) (same for trade secrets). No one suggests the government could come onto the Hornes' farm uninvited and walk off with forty-seven percent

of their crops without offering just compensation, even if the seizure itself were justified (for example, as a wartime measure). *See Dolan v. City of Tigard*, 512 U.S. 374, 384 (1994); *Nollan v. Cal. Coastal Comm'n*, 483 U.S. 825, 831 (1987); *United States v. Pewee Coal Co.*, 341 U.S. 114, 115-17 (1951) (government's wartime seizure and operation of a coal mine to prevent a national coal miners' strike constituted a compensable taking). Certainly, that government action is authorized does not immunize it from a takings claim; indeed, the Takings Clause *presupposes* that the government has taken lawfully. *Lingle*, 544 U.S. at 543; *see Kaiser Aetna*, 444 U.S. at 172 (no "blanket exception" to the Takings Clause simply because Congress has acted under lawful authority). If the Raisin Marketing Order authorized an uninvited, forcible taking of the Hornes' crops, there is no question that the government would have "a categorical duty to compensate the [Hornes], regardless of whether the interest that is taken constitutes an entire parcel [i.e., all their crops,] or merely a part thereof." *Tahoe-Sierra*, 535 U.S. at 322 (internal citation omitted).

**[5]** But a forcible taking is not what the Raisin Marketing Order accomplishes. Far from compelling a physical taking of the Hornes' tangible property, the Raisin Marketing Order applies to the Hornes only insofar as they voluntarily choose to send their raisins into the stream of interstate commerce. Simply put, it is a use restriction, not a direct appropriation. The Secretary of Agriculture did not authorize a forced seizure of forty-seven percent of the Hornes' 2002-03 crops and thirty percent of their 2003-04 crops, but rather imposed a condition on the Hornes' *use* of their crops by regulating their sale. As we explained in a similar context over seventy years ago, the Raisin Marketing Order "contains no absolute requirement of the delivery of [reserve-tonnage raisins] to the [RAC]" but rather only "a conditional one." *Wallace v. Hudson-Duncan & Co.*, 98 F.2d 985, 989 (9th Cir. 1938) (rejecting a takings challenge to a reserve requirement under the walnut marketing order).

In rejecting a claim that a local mobile home rent control ordinance amounted to a physical taking of park owners' property interest, the Supreme Court similarly explained that "[t]he government effects a physical taking only where it *requires* the landowner to submit to the physical occupation of his land." *Yee v. City of Escondido*, 503 U.S. 519, 527 (1992) (emphasis in original). Emphasizing that the " 'element of required acquiescence is at the heart of the concept of occupation,' " *id.* (quoting *FCC v. Fla. Power Corp.*, 480 U.S. 245, 252 (1987)), the Court explained that the mobile park owners had no physical takings claim because they *voluntarily* rented their land to mobile home owners and thus acquiesced in the regulation not under government compulsion but of their own accord, *id.* at 527-28. This same logic was used to defeat a takings challenge to a statute authorizing the public disclosure of private data submitted by applicants as a condition on registering their pesticides. *See Ruckelshaus*, 467 U.S. at 1007. Even though the applicants had a recognized interest in their intellectual property, the Supreme Court reasoned that "a voluntary submission of data by an applicant in exchange for the economic advantages of a registration can hardly be called a taking," so long as the disclosure condition was rationally related to a legitimate government interest and the applicant was made aware of the condition in advance. *Id.*

**[6]** There are, of course, limits to what conditions the government can constitutionally impose. The government "may not require a person to give up a constitutional right—[for example,] the right to receive just compensation when property is taken for a public use—in exchange for a discretionary benefit conferred by the government where the benefit has little or no relationship to the property." *Dolan*, 512 U.S. at 385. Thus, where the government conditioned the grant of a coastal development permit on the granting of a public easement bearing no nexus to the original purpose of the building restriction, the Supreme Court held that the government could not avoid paying compensation simply by shoehorning a taking into an unrelated exercise of its police powers. *Nollan*,

483 U.S. at 837; *see also Dolan*, 512 U.S. at 395 (holding that city could not require development permit applicant to grant a public pathway easement where there was no reasonable relationship between the proposed development and the condition imposed). Here, however, the condition imposed is rationally related to the government's legitimate interest in controlling the supply of raisins on the domestic market so as to prevent price destabilization and corollary effects on the economy, and the Hornes had ample prior notice of the condition before they voluntarily decided to enter the raisin market.

Nevertheless, the Hornes insist their so-called "voluntary" subjection to the Raisin Marketing Order is in fact the product of a Hobson's choice, for they have no economically viable alternative to selling their raisins and therefore must suffer the complete and total taking of a designated percentage of their raisins under compulsion. Their argument is founded on an erroneous belief that they have a property right to "market their [raisins] free of regulatory controls," *Cal-Almond*, 30 Fed. Cl. at 246, and is unavailing.

Admittedly, the Raisin Marketing Order's expansive definition of "handler," which includes anyone who "packs" raisins for sale even if the raisins are sold exclusively within the state of California, renders its regulatory reach less escapable than the marketing order at issue in *Wallace*, which did not apply to walnuts sold within the state of production. *See Wallace*, 98 F.2d at 989. Nonetheless, we noted in *Wallace* a "distinction between the direct appropriation of property and the destruction of property values in the exercise of governmental power," *id.*, observing that the regulation would remain valid "[e]ven if the [c]ompany were able to show . . . that the only alternative to making delivery to the [government] of surplus walnuts or their 'credit value' would be to go out of business," *id.* at 990.

**[7]** This seemingly draconian result flows from the longstanding notion that "some [property] values are enjoyed

under an implied limitation and must yield" to the government's regulatory powers. *Mahon*, 260 U.S. at 413. The implied restrictions on our property rights "are the burdens we all must bear in exchange for the advantage of living and doing business in a civilized community," *Ruckelshaus*, 467 U.S. at 1007 (internal quotation marks and citations omitted). Our takings jurisprudence is "guided by the understandings of our citizens regarding the content of, and the State's power over, the 'bundle of rights' that they acquire when they obtain title to property," *Lucas*, 505 U.S. at 1027, and not every restriction on our use of property amounts to a compensable taking.

Although the Fifth Amendment, as previously discussed, protects real and personal property alike, the personal property "bundle of rights" is not coextensive with the bundle comprising real property, as they are informed by different background principles. *See id.* at 1027-30. Consequently, the same government action may effect a taking when applied to one type of property but not the other. Whereas a regulation depriving a landowner of "*all* economically beneficial uses" of his land effects a categorical taking, *see Lucas*, 505 U.S. at 1019 (emphasis in original), the same may not necessarily be true of a regulation banning the sale of a commercial product, *see, e.g.*, *Andrus v. Allard*, 444 U.S. 51, 66-67 (1979) (holding that prohibition on sale of eagle feathers was not a taking); *Ruppert v. Caffey*, 251 U.S. 264 (1920) (upholding sales ban on nonintoxicating alcoholic beverages against takings challenge); *James Everard's Breweries v. Day*, 265 U.S. 545 (1924) (upholding ban on sale of all liquor, including liquor lawfully manufactured before passage of the statute). While the total deprivation of beneficial use of land carries a "heightened risk that private property is being pressed into some form of public service under the guise of mitigating serious public harm," *Lucas*, 505 U.S. at 1018, when it comes to personal property, "the State's traditionally high degree of control over commercial dealings" ought to put a property owner on notice "of the possibility that new regulation might

even render his property economically worthless (at least if the property's only economically productive use is sale or manufacture for sale)," *id.* at 1027-28. Thus, although the right to sell their raisins is a significant one, it is but one "strand" in the Hornes' bundle, and even the destruction of that single strand would not amount to a taking without undergoing *Penn Central* ad hoc review. *See Andrus*, 444 U.S. at 65-66 ("significant restriction . . . imposed on one means of disposing of the artifacts" does not amount to a taking); *see also Rock Royal*, 307 U.S. at 572 ("As the Congress would have, clearly, the right to permit only limited amounts of milk to move in interstate commerce, . . . it might permit the movement on terms of pool settlement . . . .").

**[8]** In any event, the Raisin Marketing Order does *not* destroy that strand and does *not* deny raisin farmers all economically beneficial use of their raisins, for the regulation does not ban the sale of raisins altogether but only requires the delivery to the RAC of a certain percentage of raisins prepared for market. The Hornes insist the regulation effects a total taking of those reserve-tonnage raisins, but they ignore the Supreme Court's repeated admonition that we must consider the regulation's impact on "the parcel as a whole" rather than "divide a single parcel into discrete segments and attempt to determine whether rights in a particular segment have been entirely abrogated." *Penn Cent.*, 438 U.S. at 130-131 & n.27; *accord Tahoe-Sierra*, 535 U.S. at 327. For example, where a statute required coal companies to leave unmined fifty percent of their coal beneath certain structures to prevent land subsidence, the Supreme Court found no taking, reasoning that "[t]he 27 million tons of coal do not constitute a separate segment of property for takings law purposes." *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 498 (1987).

**[9]** Accordingly, the Hornes' argument that they have suffered a complete and total taking of their reserve-tonnage raisins is squarely foreclosed by case law, for the relevant parcel

here is the entirety of their annual crop, not the individual raisins destined for the reserve pool. Even if in absolute terms they number in the billions, the reserve-tonnage raisins are but a designated percentage of a producer's total annual crop handled for sale in the domestic market. Furthermore, the Hornes have put forth no evidence that the Raisin Marketing Order "makes it impossible for [them] to profitably engage in their business." *Id.* at 485. We imagine it would be difficult for the Hornes to gather such evidence, given that the reserve-pool restrictions on the market supply of raisins serve to *raise* prices for the Hornes' free-tonnage raisins, ostensibly making their business *more* profitable than it would be in an unregulated free market.

**[10]** The Hornes have suffered no compensable *physical* taking of any portion of their crops, and thus the Fifth Amendment poses no obstacle to the Secretary's enforcement of the Raisin Marketing Order against them. Because the Hornes do not advance the alternative theory that the Raisin Marketing Order effects a regulatory taking, we leave that question for another day.

## III. Excessive Fines Claim

Finally, in connection with their takings argument, the Hornes protest the JO's imposition of nearly $700,000 in combined assessments and fines, which they believe excessively penalizes them, in violation of the Eighth Amendment, for their justified refusal to deliver their own private property into the hands of the government. *See* U.S. Const. amend. VIII ("Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.").

**[11]** To prevail on an excessive fines claim, a plaintiff must establish (1) the assessment is imposed, at least in part, for punitive and not merely remedial purposes, and (2) the fine is excessive, or "grossly disproportional to the gravity of [the] offense" for which it is imposed. *Bajakajian*, 524 U.S.

at 334; *see Engquist v. Or. Dep't of Agric.*, 478 F.3d 985, 1006 (9th Cir. 2007); *Mackby*, 339 F.3d at 1016. Although an excessive punitive civil fine is not beyond the Eighth Amendment's reach, *Hudson v. United States*, 522 U.S. 93, 103 (1997), civil forfeiture that merely "provides a reasonable form of liquidated damages" as compensation for government losses resulting from the unlawful activity is remedial, not punitive, and accordingly does not implicate the Eighth Amendment, *One Lot Emerald Cut Stones & One Ring v. United States*, 409 U.S. 232, 237 (1972); *see United States v. $273,969.04 U.S. Currency*, 164 F.3d 462, 466 (9th Cir. 1999); *Austin v. United States*, 509 U.S. 602, 622 n.14 (1993) ("[A] fine that serves purely remedial purposes cannot be considered 'excessive' in any event.").

**[12]** Here, the district court correctly determined that the $8,783.39 in unpaid assessments imposed pursuant to 7 C.F.R. § 989.80(a) and the $483,843.53 in compensation for the withheld reserve-tonnage raisins imposed pursuant to 7 C.F.R. § 989.166(c) amounted to remedial rather than punitive forfeitures and that the Excessive Fines Clause therefore is inapplicable to those penalties. The JO's order that the Hornes pay assessments to the RAC was calculated solely to compensate the RAC for the mandatory assessments not paid. *See* 7 C.F.R. § 989.80(a) ("Each handler shall, with respect to free tonnage acquired by him . . . pay to the committee, upon demand, his pro rata share of the expenses . . . which the Secretary finds will be incurred, as aforesaid, by the committee during each crop year . . . ."). Similarly, the JO's order that the Hornes compensate the RAC for the withheld reserve-tonnage raisins flowed inexorably from another remedial, non-punitive provision of the regulations. *See id.* § 989.166(c) ("A handler who fails to deliver to the Committee, upon request, any reserve tonnage raisins in the quantity and quality for which he has become obligated . . . shall compensate the Committee for the amount of the loss resulting from his failure to so deliver," as determined by a fixed formula.). Calculation of the compensation amount is nondiscretionary and is

limited by the extent of the government's loss. *Cf. $273,969.04*, 164 F.3d at 466 (inferring punitive nature of a sanction where it was not limited by the extent of the government's loss and was tied to commission of a crime). The JO's use of the "field price" to calculate the compensatory amount the Hornes owed the RAC for their withheld reserve-tonnage raisins was consistent with the regulations. *See* 7 C.F.R. § 989.166(c).

**[13]** The only sanction that implicates the Excessive Fines Clause is the $202,600 fine imposed pursuant to 7 U.S.C. § 608c(14)(B), but we again agree with the district court that this civil penalty, less than one-third the authorized statutory amount, is not "grossly disproportional to the gravity of [the Hornes'] offense." *Bajakajian*, 524 U.S. at 334. Although we have no set formula for determining the proportionality of a given penalty, relevant factors include the severity of the offense, the statutory maximum penalty available, and the harm caused by the offense. *Mackby*, 339 F.3d at 1016; *see also United States v. 3814 NW Thurman St.*, 164 F.3d 1191, 1197-98 (9th Cir. 1999).

We have previously recognized that noncompliance with a marketing order's reporting and reserve requirements are serious offenses that threaten the Secretary's ability to regulate a given market and prevent price destabilization, while also unjustly enriching the offenders who profit from selling their reserve-tonnage goods on the open market. *See Balice v. U.S. Dep't of Agric.*, 203 F.3d 684, 693, 695, 698-99 (9th Cir. 2000) (upholding a fine of $225,500 imposed on an almond handler subject to up to $528,000 in fines for violations of various reporting and reserve requirements). Furthermore, that Congress authorized a much steeper fine ($1,000 for each of the Hornes' 673 separate offenses spanning a two-year period, for a total of $673,000) than what the JO actually imposed, while not dispositive, weighs heavily against finding the fine grossly disproportional to the Hornes' offense, for "judgments about the appropriate punishment for an offense belong in the

first instance to the legislature." *Bajakajian*, 524 U.S. at 336, 339 n.14; *accord Balice*, 203 F.3d at 699.[13] In light of these factors, we cannot say the district court erred in finding the penalties consistent with the Eighth Amendment.[14]

## CONCLUSION

The Hornes are clearly dissatisfied and frustrated with a regulatory scheme they believe no longer serves the interests of the farmers it was designed, in large part, to protect. That being the case, the Hornes may wish to "take their case to the Secretary for a reevaluation of the [Raisin Marketing] Order and the regulations, for although the [Raisin Marketing] Order and the regulations are lawful, plaintiffs and other producers may prevail upon the Secretary to change them in order to better achieve the purpose behind the [AMAA]." *Prune Bargaining Ass'n v. Butz*, 444 F. Supp. 785, 793 (N.D. Cal.

---

[13]Although in *Balice* it appears the JO imposed penalties under only 7 U.S.C. § 608c(14) and not under the regulation's forfeiture provisions, whereas here the JO imposed both, nothing in the statutory or regulatory language seems to preclude simultaneous imposition of remedial and punitive sanctions under the respective provisions. To the contrary, 7 C.F.R. § 989.166(c) expressly provides that compensation for failure to deliver reserve-tonnage raisins "shall be in addition to, and not exclusive of, any or all of the remedies or penalties prescribed in the act" for noncompliance with the act or regulation's requirements, and the Hornes do not challenge the legitimacy of this provision.

[14]We also reject the Hornes' contention that 7 U.S.C. § 608c(14)(B) exempts them from liability for their Raisin Marketing Order violations because in 2007 they filed an administrative petition pursuant to 7 U.S.C. § 608c(15)(A). *See* 7 U.S.C. § 608c(14)(B) (immunizing from civil penalty any handler who "in good faith and not for delay" files and prosecutes a qualifying administrative petition). First, this argument was already disposed of in one of our earlier decisions, *see Horne*, 397 Fed. Appx. at 486, and is not properly before us now. Moreover, even if the matter were properly before us, it is without merit. Section 608c(14)(B) only immunizes handlers from penalties otherwise incurred during the pendency of their administrative petition; it does not apply retroactively. Therefore, an administrative petition not filed until 2007 cannot immunize the Hornes from fines relating to their conduct in 2002-04.

1975), *aff'd sub nom. Prune Bargaining Ass'n v. Bergland*, 571 F.2d 1132 (9th Cir. 1978) (per curiam); *see* 7 U.S.C. § 608c(16) (prescribing mechanism for termination or suspension of marketing orders). Our role, however, is limited to reviewing the constitutionality and not the wisdom of the current regulation. Finding no constitutional infirmity in either the Raisin Marketing Order or the Secretary's application of it to the Hornes, the summary judgment of the district court is **AFFIRMED.**