(Slip Opinion) OCTOBER TERM, 2012 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## HORNE ET AL. *v.* DEPARTMENT OF AGRICULTURE

CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 12–123.   Argued March 20, 2013—Decided June 10, 2013

The Agricultural Marketing Agreement Act of 1937 (AMAA), which was enacted to stabilize prices for agricultural commodities, regulates only "handlers," *i.e.,* "processors, associations of producers, and others engaged in the handling" of covered agricultural commodities, 7 U. S. C. §608c(1).  Any handler that violates the Secretary of Agriculture's marketing orders may be subject to civil and criminal penalties.  §§608a(5), 608a(6), and 608c(14).  One such order, the California Raisin Marketing Order (Marketing Order or Order), established a Raisin Administrative Committee (RAC), which recommends setting up annual reserve pools of raisins that are not to be sold on the open domestic market, and which recommends what portion of a particular year's production should be included in the pool.  The Order also requires handlers to pay assessments to help cover the RAC's administrative costs.

Petitioners, California raisin growers, started a business that processed more than 3 million pounds of raisins from their farm and 60 other farms during the two crop years.  When they refused to surrender the requisite portions of raisins to the reserve, the United States Department of Agriculture (USDA) began administrative proceedings, alleging that petitioners were handlers who were required to retain raisins in reserve and pay assessments.  Petitioners countered that as producers, they were not subject to the Order.  They also raised an affirmative defense that the Order violated the Fifth Amendment's prohibition against taking property without just compensation.  An Administrative Law Judge found that petitioners were handlers, found that they had violated the AMAA and the Marketing Order, and rejected their takings defense.  On appeal, a judicial officer agreed that petitioners were handlers who had violated the

Marketing Order, imposed fines and civil penalties, and declined to address the takings claim. Petitioners sought review in the Federal District Court. Granting summary judgment to the USDA, it found that substantial evidence supported the agency's determination that petitioners were handlers rather than producers, and it rejected petitioners' takings claim. The Ninth Circuit affirmed. It agreed that petitioners were handlers subject to the Marketing Order, but concluded that it lacked jurisdiction to resolve the takings claim, which they should have raised in the Court of Federal Claims. It recognized that when a handler raises a takings defense, Court of Federal Claims Tucker Act jurisdiction gives way to the AMAA's comprehensive remedial scheme, see 7 U. S. C. §608c(15), but found that petitioners had brought the takings claim in their capacity as producers.

*Held*: The Ninth Circuit has jurisdiction to decide petitioners' takings claim. Pp. 9–15.

(a) That court incorrectly determined that petitioners brought their takings claim as producers rather than handlers. Petitioners argued that they were producers—and thus not subject to the AMAA or the Marketing Order—but both the USDA and the District Court concluded that they were handlers. And the fines and civil penalties for failure to reserve raisins were levied on them in that capacity. Because the Marketing Order imposes duties on petitioners only in their capacity as handlers, their takings claim raised as a defense against those duties is necessarily raised in that same capacity. In finding otherwise, the Ninth Circuit confused petitioners' statutory argument that they were producers with their constitutional argument that, assuming they were handlers, their fine violated the Fifth Amendment. The relevant question is whether a federal court has jurisdiction to adjudicate a takings defense raised by a handler seeking review of a final agency order. Pp. 9–10.

(b) The Government's claim that petitioners' takings-based defense was rightly dismissed on ripeness grounds is unpersuasive, and its reliance on *Williamson County Regional Planning Comm'n* v. *Hamilton Bank of Johnson City,* 473 U. S. 172, is misplaced. There, a plaintiff's claim that a zoning decision effected a taking without just compensation was not ripe. But the claim failed because the plaintiff could not show that it had been injured by the Government's action when there had been no final decision. Here, petitioners were subject to a final agency order imposing concrete fines and penalties. The takings claim in *Williamson County* was also not yet ripe because the plaintiff had not sought "compensation through the procedures [provided by] the State." *Id.*, at 194. The Government argues that petitioners' takings claim is premature because the Tucker Act affords a remedy, but, in fact, the AMAA provides a comprehensive remedial

Syllabus

scheme that withdraws Tucker Act jurisdiction over a handler's takings claim. As a result, there is no alternative remedy. Pp. 10–14.

(c) A takings-based defense may be raised by a handler in the context of an enforcement proceeding initiated by the USDA under §608c(14). The provision's text does not bar handlers from raising constitutional defenses to the USDA's enforcement action. Allowing handlers to do so would not diminish the incentive to file direct challenges to marketing orders under §608c(15)(A), for a handler who refuses to comply with a marketing order and waits for an enforcement action will be liable for significant monetary penalties if the constitutional challenge fails. It would also make little sense to force a party to pay an assessed fine in one proceeding and then turn around and sue for recovery of that same money in another proceeding. See *Eastern Enterprises* v. *Apfel*, 524 U. S. 498, 520. Pp. 14–15.

673 F. 3d 1071, reversed and remanded.

THOMAS, J., delivered the opinion for a unanimous Court.

NOTICE: This opinion is subject to formal revision before publication in the
preliminary print of the United States Reports. Readers are requested to
notify the Reporter of Decisions, Supreme Court of the United States, Wash-
ington, D. C. 20543, of any typographical or other formal errors, in order
that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

_____

No. 12–123

_____

## MARVIN D. HORNE, ET AL., PETITIONERS *v.* DEPARTMENT OF AGRICULTURE

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[June 10, 2013]

JUSTICE THOMAS delivered the opinion of the Court.

Under the Agricultural Marketing Agreement Act of 1937 (AMAA) and the California Raisin Marketing Order (Marketing Order or Order) promulgated by the Secretary of Agriculture, raisin growers are frequently required to turn over a percentage of their crop to the Federal Government. The AMAA and the Marketing Order were adopted to stabilize prices by limiting the supply of raisins on the market. Petitioners are California raisin growers who believe that this regulatory scheme violates the Fifth Amendment. After petitioners refused to surrender the requisite portion of their raisins, the United States Department of Agriculture (USDA) began administrative proceedings against petitioners that led to the imposition of more than $650,000 in fines and civil penalties. Petitioners sought judicial review, claiming that the monetary sanctions were an unconstitutional taking of private property without just compensation. The Ninth Circuit held that petitioners were required to bring their takings claim in the Court of Federal Claims and that it therefore lacked jurisdiction to review petitioners' claim. We disagree.

Petitioners' takings claim, raised as an affirmative defense to the agency's enforcement action, was properly before the court because the AMAA provides a comprehensive remedial scheme that withdraws Tucker Act jurisdiction over takings claims brought by raisin handlers. Accordingly, we reverse and remand to the Ninth Circuit.

## I

### A

Congress enacted the AMAA during the Great Depression in an effort to insulate farmers from competitive market forces that it believed caused "unreasonable fluctuations in supplies and prices." Ch. 296, 50 Stat. 246, as amended, 7 U. S. C. §602(4). To achieve this goal, Congress declared a national policy of stabilizing prices for agricultural commodities. *Ibid.* The AMAA authorizes the Secretary of Agriculture to promulgate marketing orders that regulate the sale and delivery of agricultural goods. §608c(1); see also *Block* v. *Community Nutrition Institute*, 467 U. S. 340, 346 (1984) ("The Act contemplates a cooperative venture among the Secretary, handlers, and producers the principal purposes of which are to raise the price of agricultural products and to establish an orderly system for marketing them"). The Secretary may delegate to industry committees the authority to administer marketing orders. §608c(7)(C).

The AMAA does not directly regulate the "producer[s]" who grow agricultural commodities, §608c(13)(B); it only regulates "handlers," which the AMAA defines as "processors, associations of producers, and others engaged in the handling" of covered agricultural commodities. §608c(1). Handlers who violate the Secretary's marketing orders may be subject to civil and criminal penalties. §§608a(5), 608a(6), and 608c(14).

The Secretary promulgated a marketing order for Cali-

fornia raisins in 1949.[1]  See 14 Fed. Reg. 5136 (codified, as amended, at 7 CFR pt. 989 (2013)).  In particular, "[t]he Raisin Marketing Order, like other fruit and vegetable orders adopted under the AMAA, [sought] to stabilize producer returns by limiting the quantity of raisins sold by handlers in the domestic competitive market."  *Lion Raisins, Inc.* v. *United States*, 416 F. 3d 1356, 1359 (CA Fed. 2005).  The Marketing Order defines a raisin "handler" as "(a) [a]ny processor or packer; (b) [a]ny person who places . . . raisins in the current of commerce from within [California] to any point outside thereof; (c) [a]ny person who delivers off-grade raisins . . . into any eligible non-normal outlet; or (d) [a]ny person who blends raisins [subject to certain exceptions]."  7 CFR §989.15.

The Marketing Order also established the Raisin Administrative Committee (RAC), which consists of 47 members, with 35 representing producers, ten representing handlers, one representing the cooperative bargaining associations, and one member of the public.  See §989.26.  The Marketing Order authorizes the RAC to recommend setting up annual reserve pools of raisins that are not to be sold on the open domestic market.  See 7 U. S. C. §608c(6)(E); 7 CFR §§989.54(d) and 989.65.  Each year, the RAC reviews crop yield, inventories, and shipments and makes recommendations to the Secretary whether or not there should be a reserve pool. §989.54.  If the RAC recommends a reserve pool, it also recommends what portion of that year's production should be included in the pool ("reserve-tonnage").  The rest of that year's production remains available for sale on the open market ("free-tonnage").  §§989.54(d), (a).  The Secretary approves the

_____

[1] The AMAA also applies to a vast array of other agricultural products, including "[m]ilk, fruits (including filberts, almonds, pecans and walnuts . . . , pears, olives, grapefruit, cherries, caneberries (including raspberries, blackberries, and loganberries), cranberries, . . . tobacco, vegetables, . . . hops, [and] honeybees." §608c(2).

recommendation if he determines that the recommen-
dation would "effectuate the declared policy of the Act."
§989.55. The reserve-tonnage, calculated as a percentage
of a producer's crop, varies from year to year.[2]

Under the Marketing Order's reserve requirements, a
producer is only paid for the free-tonnage raisins. §989.65.
The reserve-tonnage raisins, on the other hand, must be
held by the handler in segregated bins "for the account" of
the RAC. §989.66(f). The RAC may then sell the reserve-
tonnage raisins to handlers for resale in overseas markets,
or may alternatively direct that they be sold or given at no
cost to secondary, noncompetitive domestic markets, such
as school lunch programs. §989.67(b). The reserve pool
sales proceeds are used to finance the RAC's administra-
tive costs. §989.53(a). In the event that there are any
remaining funds, the producers receive a pro rata share. 7
U. S. C. §608c(6)(E); 7 CFR §989.66(h). As a result, even
though producers do not receive payment for reserve-
tonnage raisins at the time of delivery to a handler, they
retain a limited interest in the net proceeds of the RAC's
disposition of the reserve pool.

Handlers have other duties beyond managing the RAC's
reserve pool. The Marketing Order requires them to file
certain reports with the RAC, such as reports concerning
the quantity of raisins that they hold or acquire. §989.73.
They are also required to allow the RAC access to their
premises, raisins, and business records to verify the ac-
curacy of the handlers' reports, §989.77, to obtain inspec-
tions of raisins acquired, §989.58(d), and to pay certain
assessments, §989.80, which help cover the RAC's admin-
istrative costs. A handler who violates any provision of

--------

[2] In 2002–2003 and 2003–2004, the crop years at issue here, the re-
serve percentages were set at 47 percent and 30 percent of a producer's
crop, respectively. See RAC, Marketing Policy & Industry Statistics
2012, p. 28 (Table 12).

the Order or its implementing regulations is subject to a civil penalty of up to $1,100 per day. 7 U. S. C. §608c(14)(B); 7 CFR §3.91(b)(1)(vii). A handler who does not comply with the reserve requirement must "compensate the [RAC] for the amount of the loss resulting from his failure to . . . deliver" the requisite raisins. §989.166(c).

## B

Petitioners Marvin and Laura Horne have been producing raisins in two California counties (Fresno and Madera) since 1969. The Hornes do business as Raisin Valley Farms, a general partnership. For more than 30 years, the Hornes operated only as raisin producers. But, after becoming disillusioned with the AMAA regulatory scheme,[3] they began looking for ways to avoid the mandatory reserve program. Since the AMAA applies only to handlers, the Hornes devised a plan to bring their raisins to market without going through a traditional handler. To this end, the Hornes entered into a partnership with Mrs. Horne's parents called Lassen Vineyards. In addition to its grape-growing activities, Lassen Vineyards purchased equipment to clean, stem, sort, and package the raisins from Raisin Valley Farms and Lassen Vineyards. It also contracted with more than 60 other raisin growers to clean, stem, sort, and, in some cases, box and stack their raisins for a fee. The Hornes' facilities processed more

---

[3] The Hornes wrote the Secretary and to the RAC in 2002 setting out their grievances: "[W]e are growers that will pack and market our raisins. We reserve our rights under the Constitution of the United States . . . [T]he Marketing Order Regulating Raisins has become a tool for grower bankruptcy, poverty, and involuntary servitude. The Marketing Order Regulating Raisins is a complete failure for growers, handlers, and the USDA . . . [W]e will not relinquish ownership of our crop. We put forth the money and effort to grow it, not the Raisin Administrative Committee. This is America, not a communist state." App. to Pet. for Cert. 60a.

than 3 million pounds of raisins *in toto* during the 2002–
2003 and 2003–2004 crop years.  During these two crop
years, the Hornes produced 27.4% and 12.3% of the raisins
they processed, respectively.

Although the USDA informed the Hornes in 2001 that
their proposed operations made them "handlers" under the
AMAA, the Hornes paid no assessments to the RAC dur-
ing the 2002–2003 and 2003–2004 crop years.  Nor did
they set aside reserve-tonnage raisins from those produced
and owned by the more than 60 other farmers who con-
tracted with Lassen Vineyards for packing services.  They
also declined to arrange for RAC inspection of  the rai-
sins they received for processing, denied the RAC access
to their records, and held none of their own raisins in
reserve.

On April 1, 2004, the Administrator of the Agriculture
Marketing Service (Administrator) initiated an enforce-
ment action against the Hornes, Raisin Valley Farms, and
Lassen Vineyards (petitioners).  The complaint alleged
that petitioners were "handlers" of California raisins
during the 2002–2003 and 2003–2004 crop years.  It also
alleged that petitioners violated the AMAA and the Mar-
keting Order by submitting inaccurate forms to the RAC
and failing to hold inspections of incoming raisins, retain
raisins in reserve, pay assessments, and allow access to
their records.  Petitioners denied the allegations, counter-
ing that they were not "handlers" and asserting that they
did not acquire physical possession of the other producers'
raisins within the meaning of the regulations.  Petition-
ers also raised several affirmative defenses, including a
claim that the Marketing Order violated the Fifth Amend-
ment's prohibition against taking property without just
compensation.

An Administrative Law Judge (ALJ) concluded in 2006
that petitioners were handlers of raisins and thus subject
to the Marketing Order.  The ALJ also concluded that

petitioners violated the AMAA and the Marketing Order and rejected petitioners' takings defense based on its view that "handlers no longer have a property right that permits them to market their crop free of regulatory control." App. 39 (citing *Cal-Almond, Inc.* v. *United States*, 30 Fed. Cl. 244, 246–247 (1994)).

Petitioners appealed to a judicial officer who, like the ALJ, also found that petitioners were handlers and that they had violated the Marketing Order. The judicial officer imposed $202,600 in civil penalties under 7 U. S. C. §608c(14)(B); $8,783.39 in assessments for the two crop years under 7 CFR §989.80(a); and $483,843.53 for the value of the California raisins that petitioners failed to hold in reserve for the two crop years under §989.166(c). The judicial officer believed that he lacked "authority to judge the constitutionality of the various statutes administered by the [USDA]," App. 73, and declined to adjudicate petitioners' takings claim.

Petitioners filed a complaint in Federal District Court seeking judicial review of the USDA's decision. See 7 U. S. C. §608c(14)(B). The District Court granted summary judgment to the USDA. The court held that substantial evidence supported the agency's determination that petitioners were "handlers" subject to the Marketing Order, and rejected petitioners' argument that they were exempt from the Marketing Order due to their status as "producers" under §608c(13)(B). No. CV–F–08–1549 LJO SMS, 2009 WL 4895362, *15 (ED Cal., Dec. 11, 2009). Petitioners renewed their Fifth Amendment argument, asserting that the reserve-tonnage requirement constituted a physical taking. Though the District Court found that the RAC takes title to a significant portion of a California raisin producer's crop through the reserve requirement, the court held that the transfer of title to the RAC did not constitute a physical taking. See *id.*, at *26 ("'[I]n essence, [petitioners] are paying an admissions fee or

toll—admittedly a steep one—for marketing raisins.  The Government does not force plaintiffs to grow raisins or to market the raisins; rather, it directs that if they grow and market raisins, then passing title to their "reserve tonnage" raisins to the RAC is the admissions ticket'" (quoting *Evans* v. *United States*, 74 Fed. Cl. 554, 563–564 (2006))).

The Ninth Circuit affirmed.  The court agreed that petitioners were "handlers" subject to the Marketing Order's provisions, and rejected petitioners' argument that they were producers, and, thus exempt from regulation. 673 F. 3d 1071, 1078 (2012).  The court did not resolve petitioners' takings claim, however, because it concluded that that it lacked jurisdiction to do so.  The court explained that "a takings claim against the federal government must be brought [in the Court of Federal Claims] in the first instance, 'unless Congress has withdrawn the Tucker Act grant of jurisdiction in the relevant statute.'" *Id.*, at 1079 (quoting *Eastern Enterprises* v. *Apfel*, 524 U. S. 498, 520 (1998) (plurality opinion)).  The court recognized that 7 U. S. C. §608c(15) provides an administrative remedy to handlers wishing to challenge marketing orders under the AMAA, and it agreed that "when a handler, or a producer-handler in its capacity as a handler, challenges a marketing order on takings grounds, Court of Federal Claims Tucker Act jurisdiction gives way to section [60]8c(15)'s comprehensive procedural scheme and administrative exhaustion requirements."  673 F. 3d, at 1079.  But, the Ninth Circuit determined, petitioners brought the takings claim in their capacity as producers, not handlers.  *Id.*, at 1080.  Consequently, the court was of the view that "[n]othing in the AMAA precludes the Hornes from alleging in the Court of Federal Claims that the reserve program injures them in their capacity as producers by subjecting them to a taking requiring compensation."  *Ibid.*  This availability of a Federal Claims

Court action thus rendered petitioners' takings claim unripe for adjudication. *Ibid.*

We granted certiorari to determine whether the Ninth Circuit has jurisdiction to review petitioners' takings claim. 568 U. S. ___ (2012).

## II

## A

The Ninth Circuit's jurisdictional ruling flowed from its determination that petitioners brought their takings claim as producers rather than handlers. This determination is not correct. Although petitioners argued that they were producers—and thus not subject to the AMAA or Marketing Order at all—both the USDA and the District Court concluded that petitioners were "handlers." Accordingly, the civil penalty, assessment, and reimbursement for failure to reserve raisins were all levied on petitioners in their capacity as "handlers." If petitioners' argument that they were producers had prevailed, they would not have been subject to *any* of the monetary sanctions imposed on them. See 7 U. S. C. §608c(13)(B) ("No order issued under this chapter shall be applicable to any producer in his capacity as a producer").

It is undisputed that the Marketing Order imposes duties on petitioners only in their capacity as handlers. As a result, any defense raised against those duties is necessarily raised in that same capacity. Petitioners argue that it would be unconstitutional for the Government to come on their land and confiscate raisins, or to confiscate the proceeds of raisin sales, without paying just compensation; and, that it is therefore unconstitutional to fine petitioners for not complying with the unconstitutional requirement.[4] See Brief for Petitioners 54. Given that

——————

[4] The Ninth Circuit construed the takings argument quite differently, stating that petitioners believe the regulatory scheme "takes reserve-tonnage raisins belonging to producers." 673 F. 3d 1071, 1080 (2012).

fines can only be levied on handlers, petitioners' takings claim makes sense only as a defense to penalties imposed upon them in their capacity *as handlers.* The Ninth Circuit confused petitioners' statutory argument (*i.e.,* "we are producers, not handlers") with their constitutional argument (*i.e.,* "assuming we are handlers, fining us for refusing to turn over reserve-tonnage raisins violates the Fifth Amendment").[5]

The relevant question, then, is whether a federal court has jurisdiction to adjudicate a takings defense raised by a handler seeking review of a final agency order.

## B

The Government argues that petitioners' takings-based defense was rightly dismissed on ripeness grounds. Brief for Respondent 21–22. According to the Government, because a takings claim can be pursued later in the Court of Federal Claims, the Ninth Circuit correctly refused to adjudicate petitioners' takings defense. In support of its position, the Government relies largely on *Williamson County Regional Planning Comm'n* v. *Hamilton Bank of*

———————

When the agency brought its enforcement action against petitioners, however, it did not seek to recover reserve-tonnage raisins from the 2002–2003 and 2003–2004 crop years. Rather, it sought monetary penalties and reimbursement. Petitioners could not argue in the face of such agency action that the Secretary was attempting to take raisins that had already been harvested and sold. Instead, petitioners argued that they could not be compelled to pay fines for refusing to accede to an unconstitutional taking.

[5] The Government notes that petitioners did not own most of the raisins that they failed to reserve and argues that petitioners would have no takings claim based on those raisins. See Brief for Respondent 19. We take no position on the merits of petitioners' takings claim. We simply recognize that insofar as the petitioners challenged the imposition of monetary sanctions under the Marketing Order, they raised their takings-based defense in their capacity as handlers. On remand, the Ninth Circuit can decide in the first instance whether petitioners may raise the takings defense with respect to raisins they never owned.

*Johnson City,* 473 U. S. 172 (1985). Brief for Respondent 21–22 ("Just compensation need not 'be paid in advance of, or contemporaneously with, the taking; all that is required is that a 'reasonable, certain and adequate provision for obtaining compensation' exist at the time of the taking'" (quoting *Williamson County*, 473 U. S., at 194)). In that case, the plaintiff filed suit against the Regional Planning Commission, claiming that a zoning decision by the Commission effected a taking of property without just compensation. *Id.,* at 182. We found that the plaintiff's claim was not "ripe" for two reasons, neither of which supports the Government's position.

First, we explained that the plaintiff's takings claim in *Williamson County* failed because the plaintiff could not show that it had been injured by the Government's action. Specifically, the plaintiff "ha[d] not yet obtained a final decision regarding the application of the zoning ordinance and subdivision regulations to its property." *Id.,* at 186. Here, by contrast, petitioners were subject to a final agency order imposing concrete fines and penalties at the time they sought judicial review under §608c(14)(B). This was clearly sufficient "injury" for federal jurisdiction.

Second, the *Williamson County* plaintiff's takings claim was not yet ripe because the plaintiff had not sought "compensation through the procedures the State ha[d] provided for doing so." *Id.,* at 194. We explained that "[i]f the government has provided an adequate process for obtaining compensation, and if resort to that process yields just compensation, then the property owner has no claim against the Government for a taking." *Id.,* at 194–195 (internal quotation marks and alteration omitted). Stated differently, a Fifth Amendment claim is premature until it is clear that the Government has both taken property *and* denied just compensation. Although we often refer to this consideration as "prudential 'ripeness,'" *Lucas* v. *South Carolina Coastal Council,* 505 U. S. 1003, 1013

(1992), we have recognized that it is not, strictly speaking, jurisdictional.[6]  See *Stop the Beach Renourishment, Inc.* v. *Florida Dept. of Environmental Protection*, 560 U. S. ___, ___, and n. 10 (2010) (slip op., at 24, and n. 10).

Here, the Government argues that petitioners' takings claim is premature because the Tucker Act affords "the requisite reasonable, certain, and adequate provision for obtaining just compensation that a property owner must pursue."  Brief for Respondent 22.  In the Government's view, "[p]etitioners should have complied with the order, and, after a portion of their raisins were placed in reserve to be disposed of as directed by the RAC, . . . sought compensation as producers in the Court of Federal Claims for the alleged taking."  *Id.*, at 24–25.  We disagree with the Government's argument, however, because the AMAA provides a comprehensive remedial scheme that withdraws Tucker Act jurisdiction over a handler's takings claim.  As a result, there is no alternative "reasonable, certain, and adequate" remedial scheme through which petitioners (as handlers) must proceed before obtaining review of their claim under the AMAA.[7]

The Court of Federal Claims has jurisdiction over Tucker Act claims "founded either upon the Constitution, or any Act of Congress or any regulation of an executive department."  28 U. S. C. §1491(a)(1).  "[A] claim for just compensation under the Takings Clause must be brought to the Court of Federal Claims in the first instance, unless

---

[6] A "Case" or "Controversy" exists once the government has taken private property without paying for it.  Accordingly, whether an alternative remedy exists does not affect the jurisdiction of the federal court.

[7] That is not to say that a producer who turns over her reserve-tonnage raisins could not bring suit for just compensation in the Court of Claims.  Whether a producer could bring such a claim, and what impact the availability of such a claim would have on petitioners' takings-based defense, are questions going to the merits of petitioners' defense, not to a court's jurisdiction to entertain it.  We therefore do not address those issues here.

Congress has withdrawn the Tucker Act grant of jurisdiction in the relevant statute." *Eastern Enterprises*, 524 U. S., at 520 (plurality opinion); see also *United States* v. *Bormes*, 568 U. S. \_\_\_, \_\_\_ (2012) (slip op., at 5) (where "a statute contains its own self-executing remedial scheme," a court "look[s] only to that statute"). To determine whether a statutory scheme displaces Tucker Act jurisdiction, a court must "examin[e] the purpose of the [statute], the entirety of its text, and the structure of review that it establishes." *United States* v. *Fausto*, 484 U. S. 439, 444 (1988).

Under the AMAA's comprehensive remedial scheme, handlers may challenge the content, applicability, and enforcement of marketing orders. Pursuant to §§608c(15) (A)–(B), a handler may file with the Secretary a direct challenge to a marketing order and its applicability to him. We have held that "any handler" subject to a marketing order must raise any challenges to the order, including constitutional challenges, in administrative proceedings. See *United States* v. *Ruzicka*, 329 U. S. 287, 294 (1946). Once the Secretary issues a ruling, the federal district court where the "handler is an inhabitant, or has his principal place of business" is "vested with jurisdiction . . . to review [the] ruling."[8] §608c(15)(B). These statutory provisions afford handlers a ready avenue to bring takings claim against the USDA. We thus conclude that the AMAA withdraws Tucker Act jurisdiction over petitioners'

---

[8] Petitioners filed an administrative petition before the Secretary in March 2007 pursuant to §608c(15)(A) challenging the Marketing Order and its application to them. The USDA argued that they had no standing to file the petition because they had not admitted that they were handlers. The judicial officer granted the USDA's motion to dismiss the petition for lack of jurisdiction. Petitioners filed a complaint in District Court, but the court dismissed it as untimely. The Ninth Circuit affirmed. See *Horne* v. *Dept. of Agriculture*, 395 Fed. Appx. 486 (2010).

takings claim. Petitioners (as handlers) have no alterna-
tive remedy, and their takings claim was not "premature"
when presented to the Ninth Circuit.

C

Although petitioners' claim was not "premature" for
Tucker Act purposes, the question remains whether a
takings-based defense may be raised by a handler in the
context of an enforcement proceeding initiated by the
USDA under §608c(14). We hold that it may. The
AMAA provides that the handler may not be subjected
to an adverse order until he has been given "notice and
an opportunity for an agency hearing on the record."
§608c(14)(B). The text of §608c(14)(B) does not bar han-
dlers from raising constitutional defenses to the USDA's
enforcement action. Allowing handlers to raise constitu-
tional challenges in the course of enforcement proceedings
would not diminish the incentive to file direct challenges
to marketing orders under §608c(15)(A) because a handler
who refuses to comply with a marketing order and waits
for an enforcement action will be liable for significant
monetary penalties if his constitutional challenge fails.

In the case of an administrative enforcement proceed-
ing, when a party raises a constitutional defense to an
assessed fine, it would make little sense to require the
party to pay the fine in one proceeding and then turn
around and sue for recovery of that same money in another
proceeding. See *Eastern Enterprises*, *supra*, at 520. We
see no indication that Congress intended this result for
handlers subject to enforcement proceedings under the
AMAA. Petitioners were therefore free to raise their
takings-based defense before the USDA. And, because
§608c(14)(B) allows a handler to seek judicial review of an
adverse order, the district court and Ninth Circuit were
not precluded from reviewing petitioners' constitutional
challenge. The grant of jurisdiction necessarily includes

the power to review any constitutional challenges properly presented to and rejected by the agency. We are therefore satisfied that the petitioners raised a cognizable takings defense and that the Ninth Circuit erred in declining to adjudicate it.

## III

The Ninth Circuit has jurisdiction to decide whether the USDA's imposition of fines and civil penalties on petitioners, in their capacity as handlers, violated the Fifth Amendment. The judgment of the Ninth Circuit is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*