RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 19a0066p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

───────────────

BURNETTE FOODS, INC., A Michigan Corporation,

*Plaintiff-Appellee*,

*v.*

UNITED STATES DEPARTMENT OF AGRICULTURE;
SONNY PERDUE, Secretary of Agriculture,

*Defendants-Appellants*.

No. 18-1541

───────────────

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:16-cv-00021—Gordon J. Quist, District Judge.

Decided and Filed:  April 8, 2019

Before:  GRIFFIN, WHITE, and BUSH, Circuit Judges.

───────────────

#### COUNSEL

───────────────

**ON BRIEF:**  Mark B. Stern, John S. Koppel, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellants.  John J. Rosloniec, VERITY LAW, PLC, Grand Rapids, Michigan, G. Thomas Williams, MCGARRY BAIR PC, Grand Rapids, Michigan, for Appellee.

───────────────

#### OPINION

───────────────

GRIFFIN, Circuit Judge.

Cherries, both tart and sweet, are among the many agricultural products that American farmers proudly produce and American shoppers fondly consume.  Every year, half a million or so festival-goers descend upon Traverse City, Michigan for the National Cherry Festival to eat

cherries, take part in cherry-pit-spitting and cherry-pie-eating competitions, cheer on three separate parades, crown a "Cherry Queen," and generally celebrate this beloved crop.[1]  But regardless of this fruit's treasured status, and much like other crops, the Department of Agriculture heavily regulates the cherry market.  It does so through the Cherry Industry Administrative Board.  And the Board's composition is the subject of this appeal.

Federal regulations prohibit the Board from having too many members of the same "sales constituency"—i.e., an organization that represents a group of cherry handlers or growers.  At one time, eleven of the eighteen Board members were affiliated with CherrCo, Inc., an organization that markets for its members and sets minimum prices for various tart cherry products.  Plaintiff, Burnette Foods, Inc., a tart cherry handler that is not a member of CherrCo, claims CherrCo is a "sales constituency," and thus the Board's composition violates the regulations.  The Secretary of Agriculture found that CherrCo was *not* a "sales constituency," but the district court disagreed.  Because the Secretary had substantial evidence to support his decision and the district court misapplied the law in its review, we reverse and remand for entry of judgment in defendants' favor.

I.

To understand Burnette's claim, we need to understand the relationship between the farming industry (and the cherry farming industry in particular) and the federal government, before turning to the particulars of this dispute.

A.

Seeking to ensure a steady supply and price of food, Congress has exempted American farmers and food producers from many of the prohibitions on anticompetitive business practices and agreements that unreasonably restrain trade.  In 1922, for example, Congress passed a law allowing farmers "to organize together, set association policy, fix prices at which their cooperative will sell their produce, and otherwise carry on like a business corporation without

---

[1]*National Cherry Festival Fun Facts*, National Cherry Festival, https://www.cherryfestival.org/p/about/mission-and-vision/302 (last visited Feb. 11, 2019); *National Cherry Festival Events*, National Cherry Festival, https://www.cherryfestival.org/events (last visited Feb. 11, 2019).

thereby violating the antitrust laws." *Md. & Va. Milk Producers Ass'n v. United States*, 362 U.S. 458, 466 (1960) (discussing the Capper-Volstead Act); *see also* 7 U.S.C. § 291 (Capper-Volstead Act of 1922). Congress went a step further during the depths of the Great Depression. In the Agricultural Marketing Agreement Act of 1937 (AMAA), 7 U.S.C. § 602(4), Congress announced a national policy of price stabilization. *Horne v. Dep't of Agric.*, 569 U.S. 513, 516 (2013). "The AMAA authorizes the Secretary of Agriculture to promulgate marketing orders that regulate the sale and delivery of agricultural goods." *Id*. (citing 7 U.S.C. § 608(c); *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 346 (1984)). And the AMAA allows the Secretary to delegate the authority to administer marketing orders to industry committees. *Id*. at 517.

The AMAA does not regulate farmers; it regulates "handlers." 7 U.S.C. § 608c(1), (13)(B). Handlers are defined as "processors, associations of producers, and others engaged in the handling" of covered agricultural commodities—things like milk, tobacco, hops, honeybees, and numerous fruits (including cherries). § 608c(1)-(2); *see also* 7 C.F.R. § 930.11.

Through this Congressional authorization, the Secretary of Agriculture issued the Tart Cherry Order in 1996. *Tart Cherries Grown in the States of Michigan, New York, Pennsylvania, Oregon, Utah, Washington, and Wisconsin; Order Regulating Handling*, 61 Fed. Reg. 49939, 49939 (Sept. 24, 1996) (codified at 7 C.F.R. § 930). The order seeks "to improve producer returns by strengthening consumer demand through volume control and quality assurance mechanisms." *Id*. In plain English, that means emphasizing quality over quantity. One way to accomplish this goal is to cap cherry sales at an "optimum" amount. 7 C.F.R. § 930.50(a).

The Cherry Industry Administrative Board implements the order. Its members hail from nine districts: Northern Michigan, Central Michigan, Southern Michigan, New York, Oregon, Pennsylvania, Utah, Washington, and Wisconsin. *See* 7 C.F.R. § 930.20(c). Some districts have multiple Board members. 7 C.F.R. §§ 930.2, 930.20(b). To help achieve "a fair and balanced representation on the Board," the Secretary limits Board membership. In a district with multiple Board members, only one member may be from a given sales constituency (unless it's impossible to avoid a conflict). § 930.20(g).

In 1996, a "sales constituency" was "a common marketing organization or brokerage firm or individual representing a group of handlers and growers." § 930.16 (1996). CherrCo, a "federated grower cooperative" whose members account for a large share of Michigan's tart cherry production, formed thereafter. *Tart Cherries Grown in the States of Michigan, et al.; Order Amending Marketing Agreement and Order No. 930*, 66 Fed. Reg. 35891, 35893 (July 10, 2001). The Department of Agriculture in 2001 later determined that

> the primary function of CherrCo is to establish minimum prices for certain tart cherry products. The record indicates that CherrCo is not directly involved in the actual sales of its members' products. There is intense competition among its members (as well as between its members and non-members) to sell tart cherries. The competition for sales is on the basis of individual handlers' reputations, on the quality and mix of the products they offer, on any special services they provide to their customers, and on whether or not their processing plants are certified to conform with certain sanitation standards.

*Id*. Despite this unique purpose, CherrCo arguably qualified as a sales constituency under the then-applicable regulation. This concerned the Department because at the time eleven of the eighteen Board members were affiliated with CherrCo. *Id*. So the Department amended the definition of "sales constituency" to clarify that an organization such as CherrCo was not one. 66 Fed. Reg. at 35,893–94. The amendment said: "An organization which receives consignments of cherries and does not direct where the consigned cherries are sold is not a sales constituency." 7 C.F.R. § 930.16. This definition endures today.

To summarize, Congress delegated authority to the Secretary of Agriculture to stabilize food supply and price. The Secretary issued an order to cap cherry sales. The Board implements that order. The Secretary has limited the Board's membership. And the Secretary has changed that limitation to account for entities that hold cherries for growers but don't control where the cherries go once they leave.

B.

With that background in mind, we turn back to this case. Plaintiff Burnette is a Michigan corporation that handles canned tart cherries. It is not a member of CherrCo. Because Burnette specializes in canned cherries, it takes raw cherries and immediately converts them into a

finished, canned product, which has a shelf life of about one year.  Unlike Burnette, many other cherry handlers freeze their cherries immediately, which gives the cherries a multi-year shelf life.

This shelf-life disparity puts Burnette at a disadvantage when the Board caps cherry sales. While other cherry handlers can freeze their excess cherries, Burnette loses any cherries it doesn't use or sell.  This costs Burnette as much as $3 million per year in wasted inventory.

Unhappy with this continual loss of inventory due to the Board's sales restrictions, Burnette sought a legal remedy.  In mid-2011, it filed a petition with the Department of Agriculture, alleging numerous complaints with the Tart Cherry Order and related regulations. *See* 7 C.F.R. § 900.52(a).  Burnette asked the Secretary of Agriculture to exempt Burnette from the Tart Cherry Order in its entirety.  Burnette also sought a declaration that CherrCo was a "sales constituency."  Because many Board members were affiliated with CherrCo and some of those members were from the same district, if CherrCo was a "sales constituency," the Board's composition would violate § 930.20(g)'s one-member-per-sales-constituency rule.  In other words, Burnette sought to shake up who was on the Board in hopes that new Board members would mean fewer sales restrictions and thus fewer wasted cherries.

The parties appeared before an administrative law judge (ALJ) for a six-day evidentiary hearing.  The ALJ determined that CherrCo was not a "sales constituency" under § 930.16, and rejected Burnette's challenge to the composition of the Board.  Burnette appealed this ruling to the Department of Agriculture, but a judicial officer affirmed.

Displeased with the outcome of the administrative proceedings, Burnette filed suit in the United States District Court for the Western District of Michigan.  It sued the Department of Agriculture and its Secretary, challenging the judicial officer's decision on numerous grounds. Following cross-motions for summary judgment, the district court reversed the administrative findings of fact, concluding that the judicial officer's decision was not supported by substantial evidence.  Specifically, the district court ruled that CherrCo was a sales constituency because it directed where its members' cherries were sold.  It did so, said the court, because CherrCo's members sign agreements that allow it to process, prepare for market, handle, pack, store, dry, manufacture, and sell its members' tart cherries.  The court also noted that, pursuant to its

agreement with sales representatives, CherrCo was listed as the seller for all orders, had the authority to approve all orders, and could reject an order for any reason. So as the district court saw it, these aspects of CherrCo's operation amounted to substantial evidence that CherrCo qualified as a sales constituency under 7 C.F.R. § 930.16. On this basis, the court granted plaintiff's motion for summary judgment and ruled that CherrCo could not have more than one seat on the Board.[2]

Defendants now timely appeal the district court's ruling that CherrCo is a sales constituency and the corresponding grant of summary judgment in plaintiff's favor.

## II.

We review de novo a district court's decision on motions for summary judgment. *Keith v. Cty. of Oakland*, 703 F.3d 918, 923 (6th Cir. 2013). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

But because this lawsuit stems from administrative proceedings, our review is more limited. Like the district court, we review the Secretary's decision—here the judicial officer's decision—only to determine "whether [it] is in accordance with law and whether [it] is supported by substantial evidence." *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1355 (6th Cir. 1994) (quoting *Defiance Milk Prods. Co. v. Lyng*, 857 F.2d 1065, 1068 (6th Cir. 1988)). "The Secretary's decision thus must be upheld if the record contains 'such relevant evidence as a reasonable mind might accept as adequate to support the agency's conclusion.'" *Lehigh Valley Farmers v. Block*, 829 F.2d 409, 412 (3d Cir. 1987) (brackets omitted) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

---

[2]Defendants later asked the district court to amend its ruling because the regulations limit "the affiliation of a sales constituency to members on the [Board] within 'those *districts* having more than one seat on the Board.'" 7 C.F.R. § 930.20. The district court recognized its error and amended its opinion to clarify that "[n]ot more than one Board member (including an alternate Board member) [could] be from, or affiliated with, CherrCo in those districts having more than one seat on the Board."

III.

The issue we address and resolve is whether the district court erred in reversing the Secretary's determination that CherrCo is not a "sales constituency" under the applicable regulations.**3** As noted previously, a "sales constituency" is:

> [A] common marketing organization or brokerage firm or individual representing a group of handlers and growers. An organization which receives consignments of cherries and does not direct where the consigned cherries are sold is not a sales constituency.

7 C.F.R. § 930.16. So there is both a general definition (the first sentence) and an exception (the second sentence). Defendants have never contended that CherrCo falls outside the general rule; they argue the organization falls within the exception. Thus, we must determine whether the judicial officer had substantial evidence to conclude that CherrCo: (1) receives consignments of cherries from its members and (2) does *not* direct where those consigned cherries are sold.

*Receives Consignments of Cherries.* The district court and the Secretary's judicial officer agreed that CherrCo receives cherry consignments from its members, but Burnette argues that CherrCo really owns the cherries. The relevant regulations don't define "consignments," so we give the words "their ordinary, contemporary, common meaning, absent an indication" that they were intended to bear some different meaning. *Grand Traverse Band of Ottawa & Chippewa Indians v. Office of the U.S. Attorney for the W. Dist. of Mich.*, 369 F.3d 960, 967 (6th Cir. 2004) (quoting *Williams v. Taylor*, 529 U.S. 420, 431–32 (2000)). The pertinent editions of *Black's Law Dictionary* define "consignment" identically: "The act of consigning goods for custody or sale." *Consignment*, *Black's Law Dictionary* 327 (8th ed. 2004); *Consignment*, *Black's Law Dictionary* 303 (7th ed. 1999). And each defines "consign" identically: "To transfer to another's custody or charge[,] . . . [t]o give (goods) to a carrier for delivery to a designated recipient[,] . . . [or] [t]o give (merchandise or the like) to another to sell, usu[ally] with the understanding that the seller will pay the owner for the goods from the proceeds." *Consign*,

---

**3**Defendants also raise whether the prohibition, in multi-member districts, of multiple Board members from the same sales constituency applies to alternate Board members. Because we agree with defendants that there is substantial evidence that CherrCo is not a "sales constituency," we need not reach that issue.

*Black's Law Dictionary* 327 (8th ed. 2004); *Consign*, *Black's Law Dictionary* 303 (7th ed. 1999).[4]

Given these definitions, the evidence presented during the agency proceedings supports the conclusion that CherrCo "receives consignments of cherries." § 930.16. For example, James Jensen, CherrCo's president, testified that while CherrCo may have control over a member's consigned cherries and can attach a collateral value to them, that product is merely held by CherrCo and remains the fungible property of the member. Glenn LaCross, a member of CherrCo's board of directors representing a grower-member and cherry handler (Leelanau Fruit Company), testified that individual members owned the cherries sold through CherrCo. And James Nugent, a grower-member of the Board and owner of an independent orchard that joined CherrCo (Graceland Fruit, Inc.), specifically testified that members consign their cherries to CherrCo. In short, three witnesses familiar with how CherrCo operates testified that it takes cherries on consignment.

Burnette's arguments on this issue do not negate this evidence of consignment. Burnette claims that Steven Nugent testified that CherrCo owns the cherries in its possession. This is a mischaracterization—Nugent testified that the members' product would merely be "transfer[red] . . . into CherrCo's name and then [the member] could borrow against that inventory." This testimony is consistent with the other evidence suggesting that CherrCo uses its consigned cherry stock as collateral for loans to its members. In short, and as determined at every level of proceedings, substantial evidence supported the judicial officer's determination that CherrCo "receives consignments of cherries." § 930.16.

*Direct Where Cherries Are Sold.* On this issue, the judicial officer and district court disagreed. The judicial officer found that CherrCo "does not direct where the consigned cherries are sold," *see* 7 C.F.R. § 930.16, while the district court found that CherrCo does. As with the term "consignment," the regulations do not define "direct." Thus, we again must turn to a

---

[4]The Secretary amended 7 C.F.R. § 930.16 in 2001, so the seventh and eighth editions of *Black's Law Dictionary* bookend the amendment and are particularly relevant as contemporary understandings of the term's meaning. *See, e.g.*, Antonin Scalia & Brian A. Garner, *Reading Law: The Interpretation of Legal Texts* 78–92 (2012) (discussing the fixed-meaning canon of interpretation).

dictionary to discern the term's plain meaning. *See Grand Traverse Band of Ottawa & Chippewa Indians*, 369 F.3d at 967. Again, the contemporary editions of *Black's Law Dictionary* define the term identically: "To aim (something or someone)[,] . . . [t]o cause (something or someone) to move on a particular course[,] . . . [or] [t]o instruct (someone) with authority." *Direct*, *Black's Law Dictionary* 491 (8th ed. 2004); *Direct*, *Black's Law Dictionary* 471 (7th ed. 1999). But these definitions, if applied to the regulation, would make little grammatical sense. One does not "aim" sales, "cause [sales] to move on a particular course," or "instruct [sales] with authority." So we must turn to lay dictionaries. *Webster's*, for example, provides a better definition: "[T]o manage or guide by advice, helpful information, instruction, etc.[;] . . . to regulate the course of; control[;] . . . to administer[,] manage[,] supervise[;] [or] to give authoritative instructions to; command; order or ordain[.]" *Direct*, *Random House Webster's Unabridged Dictionary* 558–59 (2001). Thus, we must determine whether the judicial officer had substantial evidence to support a finding that CherrCo did *not* control, manage, or command sales.

And the judicial officer's finding was supported by such evidence. Roy Hackert, the owner of Michigan Food Processors (a CherrCo member), testified that even when CherrCo maintained a security interest in his cherries to cover financing it provided to Michigan Food Processors, CherrCo did not "have the ability to direct the sale of those cherries based on that security interest." James Nugent, again of Graceland Fruit, agreed that CherrCo "doesn't say [Graceland Fruit] ha[s] to sell to a particular entity," and instead merely sets minimum pricing for Graceland Fruit's products. Glenn LaCross testified that affiliates can sell their product through independent (meaning non-CherrCo) sales agents and that CherrCo's input is limited to invoicing and minimum-sales requirements. In fact, LaCross testified that members pick their own sales agents "based on [their] own business interests" and that the CherrCo board does not even discuss the possibility of telling members how or where to sell their product. LaCross further testified that "[w]e have always [] had the right to direct our own sales if it be through a sales brokerage constituent or an independent broker. And James Jensen testified that each member of CherrCo appoints its own, independent agent to sell its product. Jensen also testified that after CherrCo determines that the price and terms of a sale meet its requirements, it holds the product and "authorize[s] a release when a member requests us to release the product to their

customer." On the basis of this testimony, the judicial officer's determination that CherrCo is not a "sales constituency" was supported by substantial evidence. *See Lansing Dairy*, 39 F.3d at 1355.

In reaching the opposite conclusion, the district court made two legal errors. First, it flipped the standard of review on its head. The court first found substantial evidence for the conclusion that CherrCo *did* direct the sale of cherries; then it disregarded the judicial officer's contrary determination in a single, conclusory, and legally unsupported sentence: "Th[ere] is substantial evidence that CherrCo 'directs where the consigned cherries are sold' and therefore qualifies as a sales constituency under 7 C.F.R. § 930.16. The Judicial Officer's conclusion was not supported by substantial evidence." As we have long held in appeals from agency determinations, if substantial evidence supports the agency's conclusion, the district court must affirm, even if substantial evidence also exists for the opposite conclusion. *See Defiance Milk Prods. Co.*, 857 F.2d at 1069–70.

Second, the district court conflated whether CherrCo had contractual authority to do things with whether CherrCo actually did them. For example, the district court noted that CherrCo is authorized to sell cherries itself under the "Membership and Marketing Agreement" each affiliate signs, and whether it does so or licenses sales agents to do so is determined solely by its Board of Directors. Yet the record reflects—regardless of what its members have theoretically authorized CherrCo to do—that CherrCo does not sell cherries on its own. And the "sales constituency" regulation applies to what an organization *does*, not what it could do.

If CherrCo were ever to direct the sales of its members' cherries—as it seems to have the authority to do under the membership and marketing agreements its members sign—a future challenge might well succeed. But that is not the record before us. Here the record contains substantial evidence to support the finding that CherrCo doesn't direct cherry sales. Thus, substantial evidence supports the Secretary's conclusion that CherrCo falls within the exception to the regulatory definition of a "sales constituency," and its numerous members' presence on the Board poses no legal issue.

Because there was substantial evidence to support the judicial officer's finding that CherrCo (1) receives consignments of cherries and (2) does not direct where the consigned cherries are sold, the district court erred in overruling the judicial officer's conclusion that CherrCo is not a sales constituency. And because the judicial officer's conclusion was permissible, there is no limit on the number of CherrCo members who can serve on the Board. *See* 7 C.F.R. § 930.20(g).

## IV.

For these reasons, we reverse the district court's judgment and remand for entry of judgment in defendants' favor.