Justice THOMAS, concurring.
The Fifth Amendment's Takings Clause prohibits the government from "tak[ing]" private property "without just compensation." The Court correctly interprets this text by holding that a violation of this Clause occurs as soon as the government takes property without paying for it.
The United States, by contrast, urges us not to enforce the Takings Clause as written.
*2180 It worries that requiring payment to accompany a taking would allow courts to enjoin or invalidate broad regulatory programs "merely" because the program takes property without paying for it. Brief for United States as Amicus Curiae 12. According to the United States, "there is a 'nearly infinite variety of ways in which government actions or regulations can affect property interests,' " and it ought to be good enough that the government "implicitly promises to pay compensation for any taking" if a property owner successfully sues the government in court. Supplemental Letter Brief for United States as Amicus Curiae 5 (Supp. Brief) (citing the Tucker Act, 28 U.S.C. § 1491 ). Government officials, the United States contends, should be able to implement regulatory programs "without fear" of injunction or invalidation under the Takings Clause, "even when" the program is so far reaching that the officials "cannot determine whether a taking will occur." Supp. Brief 5.
This "sue me" approach to the Takings Clause is untenable. The Fifth Amendment does not merely provide a damages remedy to a property owner willing to "shoulder the burden of securing compensation" after the government takes property without paying for it. Arrigoni Enterprises, LLC v. Durham , 578 U.S. ----, ----, 136 S.Ct. 1409, 1409, 194 L.Ed.2d 821 (2016) (THOMAS, J., dissenting from denial of certiorari). Instead, it makes just compensation a "prerequisite" to the government's authority to "tak[e] property for public use." Ibid. A "purported exercise of the eminent-domain power" is therefore "invalid" unless the government "pays just compensation before or at the time of its taking." Id. , at ----, 136 S.Ct., at 1410. If this requirement makes some regulatory programs "unworkable in practice," Supp. Brief 5, so be it-our role is to enforce the Takings Clause as written.
Of course, as the Court correctly explains, the United States' concerns about injunctions may be misplaced. Ante, at 2174 - 2177. Injunctive relief is not available when an adequate remedy exists at law. E.g. , Monsanto Co. v. Geertson Seed Farms , 561 U.S. 139, 156, 130 S.Ct. 2743, 177 L.Ed.2d 461 (2010). And even when relief is appropriate for a particular plaintiff, it does not follow that a court may enjoin or invalidate an entire regulatory "program," Supp. Brief 5, by granting relief "beyond the parties to the case," Trump v. Hawaii , 585 U.S. ----, ----, 138 S.Ct. 2392, 2427, 201 L.Ed.2d 775 (2018) (THOMAS, J., concurring); see id. , at ----, 138 S.Ct., at 2425 (expressing skepticism about "universal injunctions").
Still, "[w]hen the government repudiates [its] duty" to pay just compensation, its actions "are not only unconstitutional" but may be "tortious as well." Monterey v. Del Monte Dunes at Monterey, Ltd. , 526 U.S. 687, 717, 119 S.Ct. 1624, 143 L.Ed.2d 882 (1999) (plurality opinion). I do not understand the Court's opinion to foreclose the application of ordinary remedial principles to takings claims and related common-law tort claims, such as trespass. I therefore join it in full.
Justice KAGAN, with whom Justice GINSBURG, Justice BREYER, and Justice SOTOMAYOR join, dissenting.
Today, the Court formally overrules Williamson County Regional Planning Comm'n v. Hamilton Bank of Johnson City , 473 U.S. 172, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985). But its decision rejects far more than that single case. Williamson County was rooted in an understanding of the Fifth Amendment's Takings Clause stretching back to the late 1800s. On that view, a government could take property so long as it provided a reliable mechanism to pay just compensation, even if the payment *2181 came after the fact. No longer. The majority today holds, in conflict with precedent after precedent, that a government violates the Constitution whenever it takes property without advance compensation-no matter how good its commitment to pay. That conclusion has no basis in the Takings Clause. Its consequence is to channel a mass of quintessentially local cases involving complex state-law issues into federal courts. And it transgresses all usual principles of stare decisis . I respectfully dissent.
I
Begin with the basics-the meaning of the Takings Clause. The right that Clause confers is not to be free from government takings of property for public purposes. Instead, the right is to be free from those takings when the government fails to provide "just compensation." In other words, the government can take private property for public purposes, so long as it fairly pays the property owner. That precept, which the majority does not contest, comes straight out of the constitutional text: "[P]rivate property [shall not] be taken for public use, without just compensation." Amdt. 5. "As its language indicates, [the Takings Clause] does not prohibit the taking of private property, but instead places a condition on the exercise of that power." First English Evangelical Lutheran Church of Glendale v. County of Los Angeles , 482 U.S. 304, 314, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987). And that constitutional choice accords with ancient principles about what governments do. The eminent domain power-the capacity to "take private property for public uses"-is an integral "attribute of sovereignty." Boom Co. v. Patterson , 98 U.S. 403, 406, 25 L.Ed. 206 (1879) ; see Kohl v. United States , 91 U.S. 367, 371, 23 L.Ed. 449 (1876) (The power is "essential to [the Government's] independent existence and perpetuity"). Small surprise, then, that the Constitution does not prohibit takings for public purposes, but only requires the government to pay fair value.
In that way, the Takings Clause is unique among the Bill of Rights' guarantees. It is, for example, unlike the Fourth Amendment's protection against excessive force-which the majority mistakenly proposes as an analogy. See ante , at 2170 - 2171. Suppose a law enforcement officer uses excessive force and the victim recovers damages for his injuries. Did a constitutional violation occur? Of course. The Constitution prohibits what the officer did; the payment of damages merely remedied the constitutional wrong. But the Takings Clause is different because it does not prohibit takings; to the contrary, it permits them provided the government gives just compensation. So when the government "takes and pays," it is not violating the Constitution at all. Put another way, a Takings Clause violation has two necessary elements. First, the government must take the property. Second, it must deny the property owner just compensation. See Horne v. Department of Agriculture , 569 U.S. 513, 525-526, 133 S.Ct. 2053, 186 L.Ed.2d 69 (2013) ("[A] Fifth Amendment claim is premature until it is clear that the Government has both taken property and denied just compensation" (emphasis in original)). If the government has not done both, no constitutional violation has happened. All this is well-trod ground. See, e.g. , United States v. Jones , 109 U.S. 513, 518, 3 S.Ct. 346, 27 L.Ed. 1015 (1883) ; Albert Hanson Lumber Co. v. United States , 261 U.S. 581, 586, 43 S.Ct. 442, 67 L.Ed. 809 (1923). Even the majority (despite its faulty analogy) does not contest it.
Similarly well-settled-until the majority's opinion today-was the answer to a follow-on question: At what point has the government denied a property owner just *2182 compensation, so as to complete a Fifth Amendment violation? For over a hundred years, this Court held that advance or contemporaneous payment was not required, so long as the government had established reliable procedures for an owner to later obtain just compensation (including interest for any time elapsed). The rule got its start in Cherokee Nation v. Southern Kansas R. Co. , 135 U.S. 641, 10 S.Ct. 965, 34 L.Ed. 295 (1890), where the Tribe argued that a federal statute authorizing condemnation of its property violated the Fifth Amendment because the law did not require advance payment. The Court disagreed. It held that the Takings Clause "does not provide or require that compensation shall be actually paid in advance of the occupancy of the land to be taken" so long as the government made available to the owner "reasonable, certain and adequate provision for obtaining compensation" afterward. Id. , at 659, 10 S.Ct. 965. Decade after decade, the Court repeated that principle.[1] As another case put the point: The Takings Clause does not demand "that compensation should be made previous to the taking" so long as "adequate means [are] provided for a reasonably just and prompt ascertainment and payment of the compensation." Crozier v. Krupp A.G ., 224 U.S. 290, 306, 32 S.Ct. 488, 56 L.Ed. 771 (1912). And the Court also made clear that a statute creating a right of action against the responsible government entity generally qualified as a constitutionally adequate compensatory mechanism. See, e.g. , Williams v. Parker , 188 U.S. 491, 502, 23 S.Ct. 440, 47 L.Ed. 559 (1903) ; Yearsley v. W. A. Ross Constr. Co. , 309 U.S. 18, 20-21, 60 S.Ct. 413, 84 L.Ed. 554 (1940).[2]
Williamson County followed from those decisions as night the day. The case began when a local planning commission rejected a property owner's development proposal. The owner chose not to seek compensation through the procedure the State had created-an "inverse condemnation" action against the commission. Instead, the owner sued in federal court alleging a Takings Clause violation under 42 U.S.C. § 1983. Consistent with the century's worth of precedent I have recounted above, the Court found that no Fifth Amendment violation had yet occurred. See 473 U.S. at 195, 105 S.Ct. 3108. The Court first recognized that "[t]he Fifth Amendment does not proscribe the taking of property; it proscribes taking without just compensation." Id. , at 194, 105 S.Ct. 3108. Next, the Court stated (citing no fewer than five precedents) that the Amendment does not demand that "compensation be paid in advance *2183 of, or contemporaneously with, the taking." Ibid. "[A]ll that is required," the Court continued, is that the State have provided "a 'reasonable, certain and adequate provision for obtaining compensation.' " Ibid. (quoting Cherokee Nation , 135 U.S. at 659, 10 S.Ct. 965 ). Here, the State had done so: Nothing suggested that the inverse condemnation procedure was inadequate. 473 U.S. at 196-197, 105 S.Ct. 3108. So the property owner's claim was "not yet ripe": The owner could not "claim a violation of the [Takings] Clause until it [had] used the procedure and been denied." Id. , at 194-195, 105 S.Ct. 3108.
So contrary to the majority's portrayal, Williamson County did not result from some inexplicable confusion about "how the Takings Clause works." Ante , at 2171. Far from it. Williamson County built on a long line of decisions addressing the elements of a Takings Clause violation. The Court there said only two things remotely new. First, the Court found that the State's inverse condemnation procedure qualified as a "reasonable, certain and adequate" procedure. But no one in this case disputes anything to do with that conclusion-including that the equivalent Pennsylvania procedure here is similarly adequate. Second, the Court held that a § 1983 suit could not be brought until a property owner had unsuccessfully invoked the State's procedure for obtaining payment. But that was a direct function of the Court's prior holdings. Everyone agrees that a § 1983 suit cannot be brought before a constitutional violation has occurred. And according to the Court's repeated decisions, a Takings Clause violation does not occur until an owner has used the government's procedures and failed to obtain just compensation. All that Williamson County did was to put the period on an already-completed sentence about when a takings claim arises.[3]
Today's decision thus overthrows the Court's long-settled view of the Takings Clause. The majority declares, as against a mountain of precedent, that a government taking private property for public purposes must pay compensation at that moment or in advance. See ante , at 2169 - 2170. If the government fails to do so, a constitutional violation has occurred, regardless of whether "reasonable, certain and adequate" compensatory mechanisms exist. Cherokee Nation , 135 U.S. at 659, 10 S.Ct. 965. And regardless of how many times this Court has said the opposite before. Under cover of overruling "only" a single decision, today's opinion smashes a hundred-plus years of legal rulings to smithereens.
II
So how does the majority defend taking down Williamson County and its many *2184 precursors? Its decision rests on four ideas: a comparison between takings claims and other constitutional claims, a resort to the Takings Clause's text, and theories about two lines of this Court's precedent. All are misguided. The majority uses the term "shaky foundations." Ante , at 2178. It knows whereof it speaks.
The first crack comes from the repeated assertion (already encountered in the majority's Fourth Amendment analogy, see supra , at 2181) that Williamson County treats takings claims worse than other claims founded in the Bill of Rights. See ante , at 2169 - 2170, 2170 - 2171, 2172 - 2173, 2177 - 2178. That is not so. The distinctive aspects of litigating a takings claim merely reflect the distinctive aspects of the constitutional right. Once again, a Fourth Amendment claim arises at the moment a police officer uses excessive force, because the Constitution prohibits that thing and that thing only. (Similarly, for the majority's other analogies, a bank robber commits his offense when he robs a bank and a tortfeasor when he acts negligently-because that conduct, and it alone, is what the law forbids.) Or to make the same point a bit differently, even if a government could compensate the victim in advance-as the majority requires here-the victim would still suffer constitutional injury when the force is used. But none of that is true of Takings Clause violations. That kind of infringement, as explained, is complete only after two things occur: (1) the government takes property, and (2) it fails to pay just compensation. See supra , at 2181 - 2182. All Williamson County and its precursors do is recognize that fact, by saying that a constitutional claim (and thus a § 1983 suit) arises only after the second condition is met-when the property owner comes away from the government's compensatory procedure empty-handed. That is to treat the Takings Clause exactly as its dual elements require-and because that is so, neither worse nor better than any other right.
Second, the majority contends that its rule follows from the constitutional text, because the Takings Clause does not say "[n]or shall private property be taken for public use, without an available procedure that will result in compensation." Ante , at 2184. There is a reason the majority devotes only a few sentences to that argument. Because here's another thing the text does not say: "Nor shall private property be taken for public use, without advance or contemporaneous payment of just compensation, notwithstanding ordinary procedures." In other words, the text no more states the majority's rule than it does Williamson County 's (and its precursors'). As constitutional text often is, the Takings Clause is spare. It says that a government taking property must pay just compensation-but does not say through exactly what mechanism or at exactly what time. That was left to be worked out, consistent with the Clause's (minimal) text and purpose. And from 1890 until today, this Court worked it out Williamson County 's way, rather than the majority's. See supra , at 2181 - 2182. Under our caselaw, a government could use reliable post-taking compensatory mechanisms (with payment calculated from the taking) without violating the Takings Clause.
Third, the majority tries to explain away that mass of precedent, with a theory so, well, inventive that it appears in neither the petitioner's nor her 15-plus amici 's briefs. Don't read the decisions "too broadly," the majority says. Ante , at 2175. Yes, the Court in each rejected a takings claim, instructing the property owner to avail herself instead of a government-created compensatory mechanism. But all the Court meant (the majority says) was that the plaintiffs had sought the wrong kind of relief: They could not get injunctions because *2185 the available compensatory procedures gave an adequate remedy at law. The Court still believed (so says the majority) that the cases involved constitutional violations. Or said otherwise (again, according to the majority), the Court still understood the Takings Clause to prohibit delayed payment.
Points for creativity, but that is just not what the decisions say. Most of the cases involved requests for injunctions, but the equity/law distinction played little or no role in our analyses. Instead, the decisions addressed directly what the Takings Clause requires (or not). And as already shown, supra , at 2181 - 2182, they held that the Clause does not demand advance payment. Beginning again at the beginning, Cherokee Nation decided that the Takings Clause "does not provide or require that compensation shall be actually paid in advance." 135 U.S. at 659, 10 S.Ct. 965. In Backus v. Fort Street Union Depot Co. , 169 U.S. 557, 567-568, 18 S.Ct. 445, 42 L.Ed. 853 (1898), the Court declared that a property owner had no "constitutional right to have the amount of his compensation finally determined and paid before yielding possession." By the time of Williams v. Parker , 188 U.S. at 502, 23 S.Ct. 440, the Court could state that "it is settled by repeated decisions" that the Constitution allows the taking of property "prior to any payment." Similarly, in Joslin Mfg. Co. v. Providence , 262 U.S. 668, 677, 43 S.Ct. 684, 67 L.Ed. 1167 (1923), the Court noted that "[i]t has long been settled that the taking of property ... need not be accompanied or preceded by payment, but that the requirement of just compensation is satisfied when" there is a pledge of "reasonably prompt ascertainment and payment." In Hurley v. Kincaid , 285 U.S. 95, 104, 52 S.Ct. 267, 76 L.Ed. 637 (1932), the Court repeated that the "Fifth Amendment does not entitle [a property owner] to be paid in advance of the taking." I could go on-there are eighty more years to cover, and more decisions in the early years too-but by now you probably get the idea.
Well, just one more especially good demonstration. In Yearsley v. W. A. Ross Constr. Co. , 309 U.S. 18, 60 S.Ct. 413, 84 L.Ed. 554 (1940), the plaintiffs sought money damages for an alleged Takings Clause violation. For that reason, the Court's theory about suits seeking injunctions has no possible application. Still, the Court rejected the claim: The different remedy requested made no difference in the result. And yet more important: In refusing to find a Takings Clause violation, the Court used the exact same reasoning as it had in all the cases requesting injunctions. Once again, the Court did not focus on the nature of the relief sought. It simply explained that the government had provided a procedure for obtaining post-taking compensation-and that was enough. "The Fifth Amendment does not entitle him [the owner] to be paid in advance of the taking," held the Court, quoting the last injunction case described above. Id. , at 21, 60 S.Ct. 413 (quoting Hurley , 285 U.S. at 104, 52 S.Ct. 267 ; brackets in original). Because the government had set up an adequate compensatory mechanism, the taking was "within [the government's] constitutional power." 309 U.S. at 22, 60 S.Ct. 413. Once again, the opposite of what the majority pronounces today.[4]
*2186 Fourth and finally, the majority lays claim to another line of decisions-involving the Tucker Act-but with no greater success. The Tucker Act waives the Federal Government's sovereign immunity and grants the Court of Federal Claims jurisdiction over suits seeking compensation for takings. See 28 U.S.C. § 1491(a)(1). According to the majority, this Court's cases establish that such an action "is a claim for a violation of the Fifth Amendment"-that is, for a constitutional offense that has already happened because of the absence of advance payment. Ante , at 2177, n. 7 (emphasis in original); see ante , at 2173 - 2174. But again, the precedents say the opposite. The Tucker Act is the Federal Government's equivalent of a State's inverse condemnation procedure, by which a property owner can obtain just compensation. The former, no less than the latter, forestalls any constitutional violation by ensuring that an owner gets full and fair payment for a taking. The Court, for example, stated in United States v. Riverside Bayview Homes, Inc. , 474 U.S. 121, 128, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985), that "so long as [post-taking Tucker Act] compensation is available for those whose property is in fact taken, the governmental action is not unconstitutional." Similarly, we held in Preseault v. ICC , 494 U.S. 1, 4-5, 110 S.Ct. 914, 108 L.Ed.2d 1 (1990) that when "compensation is available to [property owners] under the Tucker Act[,] the requirements of the Fifth Amendment are satisfied." And again, in Ruckelshaus v. Monsanto Co. , 467 U.S. 986, 1016, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984) we rejected a takings claim because the plaintiff could "seek just compensation under the Tucker Act" and "[t]he Fifth Amendment does not require that compensation precede the taking." All those decisions (and there are others) rested on the premise, merely reiterated in Williamson County , that the "availability of a suit for compensation against the sovereign will defeat a contention that the action is unconstitutional as a violation of the Fifth Amendment." Larson v. Domestic and Foreign Commerce Corp. , 337 U.S. 682, 697, n. 18, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949).[5]
To the extent it deals with these cases (mostly, it just ignores them), the majority says only that they (like Williamson County ) were "confused" or wrong. See ante , at 2173 - 2174, 2177, n. 7. But maybe the majority should take the hint: When a theory requires declaring precedent after precedent after precedent wrong, that's a *2187 sign the theory itself may be wrong. The majority's theory is just that.
III
And not only wrong on prior law. The majority's overruling of Williamson County will have two damaging consequences. It will inevitably turn even well-meaning government officials into lawbreakers. And it will subvert important principles of judicial federalism.
To begin with, today's decision means that government regulators will often have no way to avoid violating the Constitution. There are a "nearly infinite variety of ways" for regulations to "affect property interests." Arkansas Game and Fish Comm'n v. United States , 568 U.S. 23, 31, 133 S.Ct. 511, 184 L.Ed.2d 417 (2012). And under modern takings law, there is "no magic formula" to determine "whether a given government interference with property is a taking." Ibid. For that reason, a government actor usually cannot know in advance whether implementing a regulatory program will effect a taking, much less of whose property. Until today, such an official could do his work without fear of wrongdoing, in any jurisdiction that had set up a reliable means for property owners to obtain compensation. Even if some regulatory action turned out to take someone's property, the official would not have violated the Constitution. But no longer. Now, when a government undertakes land-use regulation (and what government doesn't?), the responsible employees will almost inescapably become constitutional malefactors. That is not a fair position in which to place persons carrying out their governmental duties.
Still more important, the majority's ruling channels to federal courts a (potentially massive) set of cases that more properly belongs, at least in the first instance, in state courts-where Williamson County put them. The regulation of land use, this Court has stated, is "perhaps the quintessential state activity." FERC v. Mississippi , 456 U.S. 742, 768, n. 30, 102 S.Ct. 2126, 72 L.Ed.2d 532 (1982). And a claim that a land-use regulation violates the Takings Clause usually turns on state-law issues. In that respect, takings claims have little in common with other constitutional challenges. The question in takings cases is not merely whether a given state action meets federal constitutional standards. Before those standards can come into play, a court must typically decide whether, under state law, the plaintiff has a property interest in the thing regulated. See Phillips v. Washington Legal Foundation , 524 U.S. 156, 164, 118 S.Ct. 1925, 141 L.Ed.2d 174 (1998) ; see also Sterk, The Demise of Federal Takings Litigation, 48 Wm. & Mary L. Rev. 251, 288 (2006) ("[I]f background state law did not recognize or create property in the first instance, then a subsequent state action cannot take property"). Often those questions-how does pre-existing state law define the property right?; what interests does that law grant?; and conversely what interests does it deny?-are nuanced and complicated. And not a one of them is familiar to federal courts.
This case highlights the difficulty. The ultimate constitutional question here is: Did Scott Township's cemetery ordinance "go[ ] too far" (in Justice Holmes's phrase), so as to effect a taking of Rose Mary Knick's property? Pennsylvania Coal Co. v. Mahon , 260 U.S. 393, 415, 43 S.Ct. 158, 67 L.Ed. 322 (1922). But to answer that question, it is first necessary to address an issue about background state law. In the Township's view, the ordinance did little more than codify Pennsylvania common law, which (the Township says) has long required property owners to make land containing human remains open to the public. See Brief for Respondents 48; Brief *2188 for Cemetery Law Scholars as Amici Curiae 6-26. If the Township is right on that state-law question, Knick's constitutional claim will fail: The ordinance, on that account, didn't go far at all. But Knick contends that no common law rule of that kind exists in Pennsylvania. See Reply Brief 22. And if she is right, her takings claim may yet have legs. But is she? Or is the Township? I confess: I don't know. Nor, I would venture, do my colleagues on the federal bench. But under today's decision, it will be the Federal District Court for the Middle District of Pennsylvania that will have to resolve this question of local cemetery law.
And if the majority thinks this case is an outlier, it's dead wrong; indeed, this case will be easier than many. Take Lucas v. South Carolina Coastal Council , 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992). There, this Court held that a South Carolina ban on development of beachfront property worked a taking of the plaintiff's land-unless the State's nuisance law already prohibited such development. See id. , at 1027-1030, 112 S.Ct. 2886. The Court then-quite sensibly-remanded the case to the South Carolina Supreme Court to resolve that question. See id. , at 1031-1032, 112 S.Ct. 2886. (And while spotting the nuisance issue, the Court may have overlooked other state-law constraints on development. In some States, for example, the public trust doctrine or public prescriptive easements limit the development of beachfront land. See Sterk, The Federalist Dimension of Regulatory Takings Jurisprudence, 114 Yale L. J. 203, 227 (2004).) Or consider Stop the Beach Renourishment, Inc. v. Florida Dept. of Environmental Protection , 560 U.S. 702, 130 S.Ct. 2592, 177 L.Ed.2d 184 (2010). The federal constitutional issue there was whether a decision of the Florida Supreme Court relating to beachfront property constituted a taking. To resolve that issue, though, the Court first had to address whether, under pre-existing Florida property law, "littoral-property owners had rights to future accretions and contact with the water superior to the State's right to fill in its submerged land." Id. , at 730, 130 S.Ct. 2592. The Court bit the bullet and decided that issue itself, as it sometimes has to (though thankfully with the benefit of a state high court's reasoning). But there is no such necessity here-and no excuse for making complex state-law issues part of the daily diet of federal district courts.
State courts are-or at any rate, are supposed to be-the "ultimate expositors of state law." Mullaney v. Wilbur , 421 U.S. 684, 691, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975). The corollary is that federal courts should refrain whenever possible from deciding novel or difficult state-law questions. That stance, as this Court has long understood, respects the "rightful independence of the state governments," "avoid[s] needless friction with state policies," and promotes "harmonious relation[s] between state and federal authority." Railroad Comm'n of Tex. v. Pullman Co. , 312 U.S. 496, 500-501, 61 S.Ct. 643, 85 L.Ed. 971 (1941). For that reason, this Court has promoted practices of certification and abstention to put difficult state-law issues in state judges' hands. See, e.g. , Arizonans for Official English v. Arizona , 520 U.S. 43, 77, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997) (encouraging certification of "novel or unsettled questions of state law" to "hel[p] build a cooperative judicial federalism"); Louisiana Power & Light Co. v. City of Thibodaux , 360 U.S. 25, 28, 79 S.Ct. 1070, 3 L.Ed.2d 1058 (1959) (approving federal-court abstention in an eminent domain proceeding because such cases "turn on legislation with much local variation interpreted in local settings"). We may as well not have bothered. Today's *2189 decision sends a flood of complex state-law issues to federal courts. It makes federal courts a principal player in local and state land-use disputes. It betrays judicial federalism.
IV
Everything said above aside, Williamson County should stay on the books because of stare decisis . Adherence to precedent is "a foundation stone of the rule of law." Michigan v. Bay Mills Indian Community , 572 U.S. 782, 798, 134 S.Ct. 2024, 188 L.Ed.2d 1071 (2014). "[I]t promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process." Payne v. Tennessee , 501 U.S. 808, 827, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991). Stare decisis , of course, is "not an inexorable command." Id. , at 828, 111 S.Ct. 2597. But it is not enough that five Justices believe a precedent wrong. Reversing course demands a "special justification-over and above the belief that the precedent was wrongly decided." Kimble v. Marvel Entertainment, LLC , 576 U.S. ----, ----, 135 S.Ct. 2401, 2409, 192 L.Ed.2d 463 (2015) (internal quotation marks omitted). The majority offers no reason that qualifies.
In its only real stab at a special justification, the majority focuses on what it calls the " San Remo preclusion trap." Ante , at 2167. As the majority notes, this Court held in a post- Williamson County decision interpreting the full faith and credit statute, 28 U.S.C. § 1738, that a state court's resolution of an inverse condemnation proceeding has preclusive effect in a later federal suit. See San Remo Hotel, L. P. v. City and County of San Francisco , 545 U.S. 323, 125 S.Ct. 2491, 162 L.Ed.2d 315 (2005) ; ante , at 2167 - 2168, 2169 - 2170, 2178 - 2179. The interaction between San Remo and Williamson County means that "many takings plaintiffs never have the opportunity to litigate in a federal forum." Ante , at 2179. According to the majority, that unanticipated result makes Williamson County itself "unworkable." Ibid.
But in highlighting the preclusion concern, the majority only adds to the case for respecting stare decisis -because that issue can always be addressed by Congress. When "correction can be had by legislation," Justice Brandeis once stated, the Court should let stand even "error[s on] matter[s] of serious concern." Square D Co. v. Niagara Frontier Tariff Bureau, Inc. , 476 U.S. 409, 424, 106 S.Ct. 1922, 90 L.Ed.2d 413 (1986) (quoting Burnet v. Coronado Oil & Gas Co. , 285 U.S. 393, 406, 52 S.Ct. 443, 76 L.Ed. 815 (1932) (dissenting)). Or otherwise said, stare decisis then "carries enhanced force." Kimble , 576 U.S., at ----, 135 S.Ct., at 2409 ; see South Dakota v. Wayfair, Inc. , 585 U.S. ----, ----, 138 S.Ct. 2080, 2101, 201 L.Ed.2d 403 (2018) (ROBERTS, C.J., dissenting) (The stare decisis "bar is even higher" when Congress "can, if it wishes, override this Court's decisions with contrary legislation"). Here, Congress can reverse the San Remo preclusion rule any time it wants, and thus give property owners an opportunity-after a state-court proceeding-to litigate in federal court. The San Remo decision, as noted above, interpreted the federal full faith and credit statute; Congress need only add a provision to that law to flip the Court's result. In fact, Congress has already considered proposals responding to San Remo -though so far to no avail. See Brief for Congressman Steve King et al. as Amici Curiae 7. Following this Court's normal rules of practice means leaving the San Remo "ball[ in] Congress's court," so that branch can decide whether *2190 to pick it up. Kimble , 576 U.S., at ----, 135 S.Ct., at 2409.[6]
And the majority has no other special justification. It says Williamson County did not create "reliance interests." Ante, at 2179. But even if so, those interests are a plus-factor in the doctrine; when they exist, stare decisis becomes "superpowered." Kimble , 576 U.S., at ----, 135 S.Ct., at 2410 ; Payne , 501 U.S. at 828, 111 S.Ct. 2597 (Stare decisis concerns are "at their acme" when "reliance interests are involved"). The absence of reliance is not itself a reason for overruling a decision. Next, the majority says that the "justification for [ Williamson County 's] state-litigation requirement" has "evolve[d]." Ante , at 2178 - 2179. But to start with, it has not. The original rationale-in the majority's words, that the requirement "is an element of a takings claim," ante , at 2178-has held strong for 35 years (including in the cases the majority cites), and is the same one I rely on today. See, e.g., Horne , 569 U.S. at 525-526, 133 S.Ct. 2053 (quoting Williamson County 's rationale); Suitum v. Tahoe Regional Planning Agency , 520 U.S. 725, 734, 117 S.Ct. 1659, 137 L.Ed.2d 980 (1997) (same); supra , at 2181 - 2182. And anyway, "evolution" in the way a decision is described has never been a ground for abandoning stare decisis . Here, the majority's only citation is to last Term's decision overruling a 40-year-old precedent. See ante , at 2178 - 2179 (citing Janus v. State, County, and Municipal Employees , 585 U.S. ----, ----, 138 S.Ct. 2448, 2472, 201 L.Ed.2d 924 (2018) ). If that is the way the majority means to proceed-relying on one subversion of stare decisis to support another-we may as well not have principles about precedents at all.
What is left is simply the majority's view that Williamson County was wrong. The majority repurposes all its merits arguments-all its claims that Williamson County was "ill founded"-to justify its overruling. Ante , at 2177 - 2178. But the entire idea of stare decisis is that judges do not get to reverse a decision just because they never liked it in the first instance. Once again, they need a reason other than the idea "that the precedent was wrongly decided." Halliburton Co. v. Erica P. John Fund, Inc. , 573 U.S. 258, 266, 134 S.Ct. 2398, 189 L.Ed.2d 339 (2014) ; see supra , at 2189. For it is hard to overstate the value, in a country like ours, of stability in the law.
Just last month, when the Court overturned another longstanding precedent, Justice BREYER penned a dissent. See Franchise Tax Bd. of Cal. v. Hyatt , 587 U.S. ----, ----, 139 S.Ct. 1485, 1506, --- L.Ed.2d ---- (2019). He wrote of the dangers of reversing legal course "only because five Members of a later Court" decide that an earlier ruling was incorrect. Id. , at ---- - ----, 139 S.Ct., at 1496-1497. He concluded: "Today's decision can only cause one to wonder which cases the Court will overrule next." Ibid. Well, that didn't take long. Now one may wonder yet again.

See also, e.g. , Yearsley v. W. A. Ross Constr. Co. , 309 U.S. 18, 21-22, 60 S.Ct. 413, 84 L.Ed. 554 (1940) ; Hurley v. Kincaid , 285 U.S. 95, 104, 52 S.Ct. 267, 76 L.Ed. 637 (1932) ; Dohany v. Rogers , 281 U.S. 362, 365, 50 S.Ct. 299, 74 L.Ed. 904 (1930) ; Joslin Mfg. Co. v. Providence , 262 U.S. 668, 677, 43 S.Ct. 684, 67 L.Ed. 1167 (1923) ; Albert Hanson Lumber Co. v. United States , 261 U.S. 581, 587, 43 S.Ct. 442, 67 L.Ed. 809 (1923) ; Hays v. Port of Seattle , 251 U.S. 233, 238, 40 S.Ct. 125, 64 L.Ed. 243 (1920) ; Bragg v. Weaver , 251 U.S. 57, 62, 40 S.Ct. 62, 64 L.Ed. 135 (1919) ; Madisonville Traction Co. v. Saint Bernard Mining Co. , 196 U.S. 239, 251-252, 25 S.Ct. 251, 49 L.Ed. 462 (1905) ; Williams v. Parker , 188 U.S. 491, 502, 23 S.Ct. 440, 47 L.Ed. 559 (1903) ; Backus v. Fort Street Union Depot Co. , 169 U.S. 557, 568, 18 S.Ct. 445, 42 L.Ed. 853 (1898) ; Sweet v. Rechel , 159 U.S. 380, 400-402, 16 S.Ct. 43, 40 L.Ed. 188 (1895).

In many of these cases, the Court held as well that if payment occurs later, it must include interest. See, e.g. , id. , at 407, 16 S.Ct. 43 ; Albert Hanson Lumber Co. , 261 U.S. at 586, 43 S.Ct. 442. That requirement flows from the constitutional demand for "just" compensation: As one of the early cases explained, the property owner must be placed "in as good position pecuniarily as he would have been if his property had not been taken." Ibid.

Contrary to the majority's description, see ante , at 2174 - 2175, and n. 6, the respondents have exactly this view of Williamson County (and of the cases preceding it). The respondents discuss (as I do, see supra , at 2181 - 2182) the "long line of precedent" holding that "the availability of a reasonable, certain, and adequate inverse-condemnation procedure fulfills the duty" of a government to pay just compensation for a taking. Brief for Respondents 22-23. The respondents then conclude (again, as I do, see supra , at 2182 - 2184) that Williamson County "sound[ly]" and "straightforwardly applied that precedent to hold that a property owner who forgoes an available and adequate inverse-condemnation remedy has not been deprived of any constitutional right and thus cannot proceed under Section 1983." Brief for Respondents 22. (Again contra the majority, the respondents' only theory of § 1983 is the one everyone agrees with-that a § 1983 suit cannot be brought before a constitutional violation has occurred.) So while I appreciate the compliment, I cannot claim to argue anything novel or "dar[ing]" here. Ante , at 2174 - 2175. My argument is the same as the respondents', which is the same as Williamson County 's, which is the same as all the prior precedents'.

The majority's supposed best case to the contrary, First English Evangelical Lutheran Church of Glendale v. County of Los Angeles , 482 U.S. 304, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987), is not so good, as is apparent from its express statement that it accords with Williamson County . See 482 U.S. at 320, n. 10, 107 S.Ct. 2378. In First English , the Court held that a property owner was entitled to compensation for the temporary loss of his property, occurring while a (later-repealed) regulation was in effect. See id. , at 321, 107 S.Ct. 2378. The Court made clear that a government's duty to compensate for a taking-including a temporary taking-arises from the Fifth Amendment, as of course it does. See id. , at 315, 107 S.Ct. 2378. But the Court nowhere suggested that a Fifth Amendment violation happens even before a government denies the required compensation. (You will scan the majority's description of First English in vain for a quote to that effect-because no such quote exists. See ante , at 2171 - 2173.) To the contrary, the Court went out of its way to recognize the Williamson County principle that "no constitutional violation occurs until just compensation has been denied." 482 U.S. at 320, n. 10, 107 S.Ct. 2378 (internal quotation marks omitted).

Jacobs v. United States , 290 U.S. 13, 54 S.Ct. 26, 78 L.Ed. 142 (1933), the Tucker Act case the majority cites to support its argument, says nothing different. The majority twice notes Jacobs ' statement that a Tucker Act claim "rest[s] upon the Fifth Amendment." Ante , at 2170 - 2171 (quoting 290 U.S. at 16, 54 S.Ct. 26 ). And so it does, because the compensatory obligation that the Tucker Act vindicates arises from-or "rests upon"-the Fifth Amendment. But that is a far cry from saying, as the majority does, that the Government has already violated the Fifth Amendment when the Tucker Act claim is brought-before the Government has denied fair compensation.

Confronted with that point, the majority shifts ground. It notes that even if Congress eliminated the San Remo rule, takings plaintiffs would still have to comply with Williamson County 's "unjustified" demand that they bring suit in state court first. See ante , at 2178 - 2179. But that argument does not even purport to state a special justification. It merely reiterates the majority's view on the merits.